## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Honorable Lois H. Goodman |
| v. | : | Mag. No. 14-4518 |
| HERVE CADET, a/k/a "Gotti," a/k/a "Bro," | : | **CRIMINAL COMPLAINT** |
| ERIC SMITH, a/k/a "EV," a/k/a "E," | : | |
| DWIGHT SIMON, a/k/a "Break Bread," | : | |
| NOBLE EL-BEY, a/k/a "Terrence Gamble," a/k/a | : | |
| "Terry Gamble," a/k/a "T," a/k/a "Terry," | : | |
| EVENS JOSEPH, a/k/a "Dirty Evan," a/k/a "E," | : | |
| HARRIEL JEAN-BAPTISTE, a/k/a "Harry," | : | |
| STEVE JEAN-BAPTISTE, a/k/a "Black," | : | |
| JUNIOR PARCIAS, a/k/a "Peso," | : | |
| KURTIS BARNES, a/k/a "Gotti," | : | |
| CHARLENE BRAITHWAITE-LOVET, a/k/a "Shay," | : | |
| ATHENA L. GILLES, a/k/a "Athena Gillis," a/k/a | : | |
| "Shorty," | : | |
| JERREL K. COLLINS, a/k/a "Fat Boy," | : | |
| DELOVI R. CANALES, a/k/a "Butter," | : | |
| LAURIE A. MATTHEWS, | : | |
| SCHNEIDER MONESTIME, | : | |
| BRANDON R. KEYES, a/k/a "BK," | : | |
| REGINALD WALKER, a/k/a "Red," | : | |
| AMAL J. BLAINE, a/k/a "Mal," | : | |
| CLARA CRAWLEY, a/k/a "Kira," | : | |
| MACKENSON CASIMIR, a/k/a "Scrappy," | : | |
| MARVIN T. BRODIE, a/k/a "Marv" | : | |

I, Michael H. Goldfinger, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Drug Enforcement Administration, and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Michael H. Goldfinger, Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

October 15, 2014                    at        Trenton, New Jersey
Date                                                City and State
Honorable Lois H. Goodman
United States Magistrate Judge
Name and Title of Judicial Officer              Signature of Judicial Officer

2

## ATTACHMENT A

From in or about November 2013 through in or about October 2014, in Monmouth, Ocean, and Middlesex Counties, in the District of New Jersey, and elsewhere, the defendants,

HERVE CADET, a/k/a "Gotti," a/k/a "Bro,"
ERIC SMITH, a/k/a "EV," a/k/a "E,"
DWIGHT SIMON, a/k/a "Break Bread,"
NOBLE EL-BEY, a/k/a "Terrence Gamble," a/k/a "Terry Gamble," a/k/a "T," a/k/a "Terry,"
EVENS JOSEPH, a/k/a "Dirty Evan," a/k/a "E,"
HARRIEL JEAN-BAPTISTE, a/k/a "Harry,"
STEVE JEAN-BAPTISTE, a/k/a "Black,"
JUNIOR PARCIAS, a/k/a "Peso,"
KURTIS BARNES, a/k/a "Gotti,"
CHARLENE BRAITHWAITE-LOVET, a/k/a "Shay,"
ATHENA L. GILLES, a/k/a "Athena Gillis," a/k/a "Shorty,"
JERREL K. COLLINS, a/k/a "Fat Boy,"
DELOVI R. CANALES, a/k/a "Butter,"
LAURIE A. MATTHEWS,
SCHNEIDER MONESTIME,
BRANDON R. KEYES, a/k/a "BK,"
REGINALD WALKER, a/k/a "Red,"
AMAL J. BLAINE, a/k/a "Mal,"
CLARA CRAWLEY, a/k/a "Kira,"
MACKENSON CASIMIR, a/k/a "Scrappy,"
MARVIN T. BRODIE, a/k/a "Marv,"

did knowingly and intentionally conspire with each other and others to distribute and possess with intent to distribute 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Section 846.

## ATTACHMENT B

I, Michael H. Goldfinger, am a Special Agent with the Drug Enforcement Administration ("DEA"). I have knowledge of the facts set forth below as a result of my participation in this investigation as well as from my review of reports from, and discussions with, other law enforcement personnel. Where statements of others are related herein, they are related in substance and in part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## BACKGROUND

1.      From at least as early as in or about November 2013 through in or about October 2014, the defendants operated a large scale drug trafficking organization ("DTO") in Monmouth, Ocean, and Middlesex Counties, New Jersey (the "Cadet DTO"). Among other things, members of the Cadet DTO supplied over 1 kilogram of heroin to other co-conspirators who then sold the heroin to various dealers, sub-dealers, and end users generating hundreds of thousands of dollars in illicit proceeds. The Cadet DTO also sold crack cocaine and powder cocaine.

2.      Based upon consensually recorded telephone calls, court-authorized interception of wire communications ("wiretaps") between in or about June 2014 and in or about October 2014, physical surveillance, law enforcement controlled purchases of heroin and crack cocaine, information from confidential informants that has proven to be reliable, and other investigative techniques, law enforcement has uncovered the organizational and operational structure of the Cadet DTO and the manner and means by which it carried out the drug trafficking conspiracy. Among other things, the Cadet DTO and its members:

a.      Received bulk quantities of heroin from various sources of supply, including individuals outside of New Jersey;

b.      Used various "stash houses" and other temporary locations to cut, package, store, and distribute heroin and other narcotics;

c.      Took steps to evade law enforcement, including: using cellular telephones with fictitious or no subscriber information; speaking in code and in a foreign language during telephone conversations to disguise the illicit nature of their discussions; and utilizing various vehicles to conceal their presence in various locations.

3.      At all times relevant to this Complaint:

a.      HERVE CADET, also known as "Gotti," also known as "Bro" ("CADET"), and ERIC SMITH, also known as "EV," also known as "E" ("SMITH"), were the leaders of the Cadet DTO and oversaw its narcotics distribution activities.

b.      CADET distributed heroin for the Cadet DTO. Among other things, CADET was responsible for supplying members of the Cadet DTO with heroin for distribution to other

dealers and end users.  CADET resided in or around Neptune, New Jersey and Sayreville, New Jersey.

       c.     SMITH distributed heroin for the Cadet DTO.  SMITH resided in or around Manchester, New Jersey.

       d.     DWIGHT SIMON, also known as "Break Bread" ("SIMON"), distributed heroin on behalf of the Cadet DTO.  SIMON resided in or around Asbury Park, New Jersey.

       e.     NOBLE EL-BEY, also known as "Terrence Gamble," also known as "Terry Gamble," also known as "T," also known as "Terry" ("EL-BEY"), distributed heroin on behalf of the Cadet DTO.  EL-BEY resided in or around Asbury Park, New Jersey.

       f.     EVENS JOSEPH, also known as "Dirty Evan," also known as "E" ("JOSEPH"), is CADET's brother and distributed heroin on behalf of the Cadet DTO.  JOSEPH resided in or around Neptune, New Jersey.

       g.     STEVE JEAN-BAPTISTE, also known as "Black" ("S. JEAN-BAPTISTE"), distributed heroin on behalf of the Cadet DTO.  S. JEAN-BAPTISTE resided in or around Asbury Park, New Jersey.

       h.     HARRIEL JEAN-BAPTISTE, also known as "Harry" ("H. JEAN-BAPTISTE"), distributed heroin on behalf of the Cadet DTO.  H. JEAN-BAPTISTE also stored and packaged quantities of heroin for the Cadet DTO for subsequent distribution to dealers and others.  H. JEAN-BAPTISTE resided in or around Asbury Park, New Jersey.

       i.     JUNIOR PARCIAS, also known as "Peso" ("PARCIAS"), distributed heroin on behalf of the Cadet DTO.  PARCIAS resided in or around Neptune, New Jersey.

       j.     KURTIS BARNES, also known as "Gotti" ("BARNES"), distributed heroin on behalf of the Cadet DTO.  BARNES resided in or around Lakewood, New Jersey.

       k.     CHARLENE BRAITHWAITE-LOVET, also known as "Shay" ("BRAITHWAITE-LOVET"), distributed heroin on behalf of the Cadet DTO.  BRAITHWAITE-LOVET resided in or around Asbury Park, New Jersey.

       l.     ATHENA L. GILLES, also known as "Athena Gillis," also known as "Shorty" ("GILLES"), distributed heroin on behalf of the Cadet DTO.  GILLES resided in or around Asbury Park, New Jersey.

       m.     JERREL K. COLLINS, also known as "Fat Boy" ("COLLINS"), distributed heroin on behalf of the Cadet DTO.  COLLINS resided in or around Ocean Township, New Jersey.

       n.     DELOVI R. CANALES, also known as "Butter" ("CANALES"), distributed heroin on behalf of the Cadet DTO.  CANALES resided in or around Toms River, New Jersey.

o.      LAURIE A. MATTHEWS ("MATTHEWS") distributed heroin on behalf of the Cadet DTO.  MATTHEWS resided in or around Whiting, New Jersey.

p.      AMAL J. BLAINE, also known as "Mal" ("BLAINE"), distributed heroin on behalf of the Cadet DTO.  BLAINE resided in or around Lakewood, New Jersey.

q.      CLARA CRAWLEY, also known as "Kira" ("CRAWLEY"), stored and packaged quantities of heroin for the Cadet DTO for subsequent distribution to dealers and others.  CRAWLEY resided in or around Edison, New Jersey and at times resided with CADET in or around Sayreville, New Jersey.

r.      MACKENSON CASIMIR, also known as "Scrappy" ("CASIMIR"), stored and packaged quantities of heroin for the Cadet DTO for subsequent distribution to dealers and others.  CASIMIR resided in or around Ocean Township, New Jersey.

s.      REGINALD WALKER, also known "Red" ("WALKER"), distributed heroin on behalf of the Cadet DTO.  WALKER resided in or around Red Bank, New Jersey.

t.      BRANDON R. KEYES, also known as "BK" ("KEYES"), distributed heroin on behalf of the Cadet DTO.  KEYES resided in or around Neptune, New Jersey.

u.      SCHNEIDER MONESTIME ("MONESTIME") distributed heroin on behalf of the Cadet DTO.  MONESTIME resided in or around Asbury Park, New Jersey.

v.      MARVIN T. BRODIE, also known as "Marv" ("BRODIE"), distributed heroin on behalf of the Cadet DTO.  BRODIE resided in or around Manchester, New Jersey.

## THE INVESTIGATION

### Cooperating Witness No. 1

4.      In or about January 2014, a cooperating witness ("CW1") provided information to law enforcement regarding the narcotics distribution activities of the Cadet DTO.  The information that CW1 provided was corroborated through other evidence, including physical surveillance and consensually recorded calls and meetings with members of the Cadet DTO.

Controlled Purchases with CW1

5.      Between in or about January 2014 and in or about April 2014, CW1 engaged in several consensually recorded calls and meetings with CADET and SIMON.  During this time, CW1 also engaged in controlled purchases of heroin and crack cocaine from CADET and SIMON.

January 15, 2014 Controlled Purchase

6.      On or about January 9, 2014, SIMON called CW1 and stated that he was waiting for a delivery of heroin and that he would contact CW1 once he received it.  SIMON informed CW1 that each brick of heroin would cost $150.  On January 14, 2014, SIMON called CW1 and told CW1 that he was ready to sell the heroin to CW1.  SIMON told CW1 that CW1 could come to SIMON's residence located at 1232 Monroe Avenue, Apartment B in Asbury Park, New Jersey ("1232 Monroe Avenue") to make the purchase.

7.      Prior to CW1 going to 1232 Monroe Avenue, law enforcement provided CW1 with $900 to purchase the heroin from SIMON and an audio recording device to record the transaction.

8.      On or about January 15, 2014, at approximately 4:30 p.m., law enforcement established surveillance outside of 1232 Monroe Avenue.  At approximately 4:46 p.m., CW1 arrived at 1232 Monroe Avenue and engaged in a conversation with SIMON.  At one point, SIMON was observed walking east on Monroe Avenue and entering 1228B Monroe Avenue. CW1 later informed law enforcement that SIMON retrieved the heroin from that location.  When SIMON returned from 1228B Monroe Avenue, he instructed CW1 to enter a vehicle parked in the driveway of his residence.

9.      Once inside the vehicle, SIMON pulled from the inside of his pants a clear plastic bag containing six bricks of heroin and placed the bag on the vehicle's console.  CW1 gave SIMON $900 as payment for the heroin.  CW1 took the clear plastic bag and exited the vehicle. Each brick was stamped with the words "U-TUBE" in red lettering.  The entirety of the controlled purchase was audio recorded.

10.     Law enforcement subsequently field-tested a sample of the substance that CW1 purchased from SIMON and it tested positive for the presence of heroin.

January 24, 2014 Controlled Purchase

11.     On or about January 23, 2014, SIMON called CW1 and told CW1 that he had heroin that was higher in quality than the heroin that he sold to CW1 on January 15, 2014. SIMON told CW1 that this new heroin was from CADET, who SIMON referred to as "Bro." SIMON told CW1 that the cost of the heroin was $170 per brick.

12.     On or about January 24, 2014, CW1 called SIMON and SIMON confirmed that he was ready to sell the heroin to CW1.  SIMON instructed CW1 to go to 1232 Monroe Avenue.

13.     Prior to CW1 going to 1232 Monroe Avenue, law enforcement provided CW1 with $1,020 to purchase the heroin from SIMON and an audio recording device to record the transaction.

14.     On or about January 24, 2014, at approximately 1:25 p.m., law enforcement established surveillance outside of 1232 Monroe Avenue.  At approximately 1:30 p.m., CW1

arrived at 1232 Monroe Avenue.  Soon thereafter, SIMON exited his residence and handed CW1 a bag containing heroin.  CW1 gave SIMON the $1,020 as payment for the heroin.  Each brick was stamped with the word "Newport" in blue lettering.  The entirety of the controlled purchase was audio recorded.

15.     Law enforcement subsequently field-tested a sample of the substance that CW1 purchased from SIMON and it tested positive for the presence of heroin.

<u>February 10, 2014 Controlled Purchase</u>

16.     On or about February 10, 2014, CW1, at the direction of law enforcement, went to 1232 Monroe Avenue for the purpose of arranging a purchase of six bricks of heroin from SIMON.  Law enforcement provided CW1 with $1,020 to purchase the heroin from SIMON and an audio recording device to record the transaction.

17.     At approximately 2:50 p.m., law enforcement established surveillance outside of 1232 Monroe Avenue.  At approximately 2:55 p.m., CW1 arrived at 1232 Monroe Avenue.  An unidentified male answered the door and informed CW1 that SIMON was not at the residence at the time.  CW1 then departed SIMON's residence.

18.     At approximately 3:15 p.m., SIMON called CW1.  During the conversation, SIMON told CW1 that he was not in the area at the time, and that his "Bro," meaning CADET, would deliver the heroin to CW1.  At approximately 3:39 p.m., SIMON sent to CW1 the following text message: "My brother will be there in 3 minutes."

19.     Prior to CW1 meeting CADET at the location told to him by SIMON, law enforcement provided CW1 with $1,020 to purchase the heroin and an audio recording device to record the transaction.  Law enforcement established surveillance in the area of the prearranged meet location.

20.     At approximately 3:50 p.m., law enforcement established surveillance in the area of the meet location in Asbury Park.  At approximately 4:05 p.m., law enforcement observed a vehicle, driven by CADET, park on the street near the meet location.  Soon thereafter, CW1 entered the front passenger side of the vehicle and engaged in conversation with CADET.  During the meeting, CADET introduced himself to CW1 as "Gotti."  During the meeting, CADET informed CW1 that he sold powder cocaine and crack cocaine, in addition to heroin.  CADET stated that the cost of crack cocaine would be $45 per gram.  CADET also stated that he currently sells heroin with three levels of purity and that the heroin stamped "White Bitch" is the best quality heroin he has available.  At some point during the meeting, CADET exited the vehicle, walked to the back of the vehicle, and opened the trunk.  Upon reentering the vehicle, CADET handed CW1 a small brown cardboard box containing six bricks of heroin.  CW1 gave CADET $1,020 as payment for the heroin.  The glassine bags of heroin contained in the bricks were stamped with the words "White Bitch" in blue lettering.  The entirety of the controlled purchase was audio recorded.

21.     Law enforcement field-tested a sample of the substance that CW1 purchased from CADET and it tested positive for the presence of heroin.

February 21, 2014 Controlled Purchase

22.     On or about February 19, 2014, CW1 sent a text message to SIMON inquiring about the price of crack cocaine.  In response, SIMON sent CW1 a text message which stated, "[l]et me call my Bro."  Soon thereafter, SIMON sent another text message to CW1 and stated that the price of crack cocaine was $45 per gram.  CW1 responded that CW1 would be ready to purchase crack cocaine from SIMON on Friday, February 21, 2014.

23.     On February 21, 2014, at approximately 1:17 p.m., CW1 and SIMON arranged to meet at a location in Asbury Park so that CW1 could purchase crack cocaine.  Prior to CW1 meeting SIMON, law enforcement provided CW1 with $1,000 to purchase the crack cocaine and an audio recording device to record the transaction.

24.     Later that afternoon, law enforcement established surveillance in the area of the meet location.  At approximately 5:25 p.m., law enforcement observed a vehicle arrive at the location.  Law enforcement observed that the vehicle was driven by SIMON with CADET in the passenger seat.  Shortly thereafter, CW1 entered the vehicle through the back passenger side door.  Subsequently, SIMON, CADET, and CW1 drove off and parked in front of a location on Asbury Avenue in Asbury Park.  While inside the vehicle, SIMON pulled from inside of his pants a plastic bag containing approximately 22 grams of crack cocaine and handed the bag to CW1.  CW1 gave SIMON $1,000 as payment for the crack cocaine.  The entirety of the controlled purchase was audio recorded.

25.     Law enforcement field-tested a sample of the substance that CW1 purchased from SIMON and CADET and it tested positive for the presence of cocaine.

February 28, 2014 Controlled Purchase

26.     On or about February 28, 2014 at approximately 12:15 p.m., CW1 called SIMON about the purchase of a cheaper brand of heroin as well as cocaine.  That call was recorded.  SIMON told CW1 that he needed to contact his "Bro."  At approximately 2:30 p.m., SIMON called CW1 and told CW1 that he did not have any "hard," which is a street term for crack cocaine, and that they did not have cheaper heroin, only the "regular stuff."  SIMON further stated that he was with his "Bro" at the time and that they would have more crack cocaine over the weekend.

27.     At approximately 4:20 p.m., CW1 called SIMON and arranged to meet him in order to purchase six bricks of heroin for $1,000.  That call was recorded.  SIMON and CW1 arranged to meet at a location in Asbury Park.

28.     Prior to CW1 meeting with SIMON, law enforcement provided CW1 with $1,000 to purchase heroin from SIMON and an audio recording device to record the transaction.

29.     At approximately 4:55 p.m., law enforcement established surveillance in the area of the location where SIMON and CW1 were to meet.  At approximately 6:08 p.m., law enforcement observed a black Nissan Armada arrive at the meet location.  Law enforcement observed that the vehicle was driven by CADET with SIMON in the passenger seat.  Upon arriving at the location, SIMON exited the passenger side of the vehicle and entered the meet location.

30.     Once inside the meet location, SIMON handed CW1 a small brown cardboard box containing six bricks of heroin.  CW1 gave SIMON $1,000 as payment for the heroin.  Law enforcement then observed SIMON exit the location, reenter the Nissan Armada driven by CADET, and drive away.  Each brick was stamped with the words "Hurricane Sandy" in red lettering.  The entirety of the controlled purchase was audio recorded.

31.     Law enforcement field-tested a sample of the substance that CW1 purchased from SIMON and CADET and it tested positive for the presence of heroin.

March 27, 2014 Controlled Purchase

32.     On or about March 27, 2014, at approximately 1:30 p.m., CW1 called SIMON and arranged to meet him in order to purchase three bricks of heroin for $510.  That call was recorded.  CW1 and SIMON arranged to meet at a location in Asbury Park.  Prior to meeting with SIMON, law enforcement provided CW1 with $510 to purchase heroin from SIMON and an audio recording device to record the transaction.

33.     That afternoon, law enforcement established surveillance in the area of the meet location.  At approximately 6:08 p.m., law enforcement observed a black Nissan Armada at the meet location.  Law enforcement observed that the vehicle was driven by CADET with SIMON in the passenger seat.  Upon arriving at the prearranged location, SIMON exited the passenger side of the vehicle and entered the location.  Once inside the prearranged location, SIMON gave CW1 three bricks of heroin.  CW1 gave SIMON $510 as payment for the heroin.  Law enforcement then observed SIMON exit the location, reenter the vehicle driven by CADET, and drive away.  Each brick was stamped with the word "Newport" in blue lettering.  The entirety of the controlled purchase was audio recorded.

34.     Law enforcement field-tested a sample of the substance that CW1 purchased from SIMON and CADET and it tested positive for the presence of heroin.

April 3, 2014 Controlled Purchase

35.     On or about April 3, 2014, at approximately 2:00 p.m., CW1 called SIMON and arranged to meet him in order to purchase three bricks of heroin for $510.  CW1 subsequently received a call from SIMON during which SIMON instructed CW1 to meet SIMON at the "corner store."  Those calls were recorded.  Prior to meeting with SIMON, law enforcement provided CW1 with $510 to purchase heroin from SIMON and an audio recording device to record the transaction.

36.     At approximately 3:45 p.m., law enforcement established surveillance in the area of the prearranged meet location, which was a local eatery.  At approximately 4:10 p.m., law enforcement observed a gray Toyota Avalon arrive and park in front of the eatery.  Law enforcement observed SIMON exit the vehicle and enter the eatery.  At approximately 4:15 p.m., law enforcement observed CW1 arrive at the eatery, engage SIMON in a conversation near the front door, and then enter the eatery with SIMON.

37.     Once inside the eatery, SIMON and CW1 walked to the back of the eatery where SIMON handed CW1 three bricks of heroin.  CW1 gave SIMON $510 as payment for the heroin. Each brick was stamped with the word "Newport" in blue lettering.  The entirety of the controlled purchase was audio recorded.

38.     Law enforcement field-tested a sample of the substance that CW1 purchased from SIMON and it tested positive for the presence of heroin.

## **Cooperating Witness No. 2**

Controlled Purchases with CW2

39.     In or about May 2014, another cooperating witness ("CW2") provided information to law enforcement regarding the narcotics distribution activities of the Cadet DTO. The information that CW2 provided was corroborated through other evidence, including physical surveillance, consensually recorded calls and meetings, and court-authorized wiretaps.[1]

40.     On several occasions between in or about May 2014 and in or about July 2014, CW2 engaged in a series of consensually recorded calls and controlled purchases of heroin from CADET.  During those communications, CADET used his cell phone, ending in -4576 (hereinafter, the "Cadet Facility") to coordinate the narcotics transactions with CW2.

June 3, 2014 Controlled Purchase

41.     On or about May 28, 2014, at approximately 8:17 p.m., CW2 called CADET on the Cadet Facility to arrange the purchase of heroin.  That call was recorded.  During the call, CW2 asked CADET, "it's still the same price, $140 right?" referring to the price for a brick of heroin.  CW2 also asked if CADET would sell CW2 the heroin for a lower price.  In response, CADET asked CW2: "you getting them now?"  When CW2 responded that CW2 was not ready to purchase the heroin yet, CADET told CW2 to call him when CW2 was ready to make the purchase.

42.     On or about May 28, 2014, at approximately 11:00 p.m., CADET called CW2 from the Cadet Facility.  During the call, CADET informed CW2 that he had the heroin for sale whenever CW2 was ready and that the price was $140 per brick.

---

[1] During certain of the recorded conversations, CADET and CW2 spoke both in English and Haitian Creole.  The Haitian Creole portions of the conversations have been translated into English.

43.     On or about June 3, 2014, at approximately 1:00 a.m., CADET called CW2. During the call, CADET told CW2 that he had three different types, or stamps, of heroin for sale. CADET told CW2 to call him as soon as CW2 was ready to make the purchase.

44.     On or about June 3, 2014, at approximately 1:00 p.m., CW2 called CADET on the Cadet Facility. That call was recorded. During the call, CW2 asked CADET if CADET had 50 bricks of heroin to sell. CADET responded, "I'll see you in a few." CADET then arranged to meet CW2 at a location in Ocean Township, New Jersey to conduct the heroin transaction. Prior to CW2 meeting with CADET, law enforcement provided CW2 with $7,000 to purchase heroin from CADET and an audio recording device to record the transaction.

45.     That afternoon, law enforcement established surveillance in the area of the prearranged meet location. At approximately 3:50 p.m., law enforcement observed CADET arrive at the prearranged meet location driving a black BMW. Law enforcement then observed CW2 meet CADET at his vehicle and enter the rear passenger side of the vehicle.

46.     Once inside the vehicle, CW2 observed an unknown female sitting in the front passenger seat and an unknown male sitting in the rear passenger seat behind the driver. CADET then exited the vehicle and retrieved a white plastic bag from the trunk. Upon reentering the vehicle, CADET handed the white plastic bag containing the heroin to CW2. CW2 gave CADET $7,000 as payment for the heroin. Some of the glassine bags were stamped with the word "Newport" in green lettering, and some were stamped with the phrase "Fly High" in blue lettering. The entirety of the controlled purchase was audio recorded.

47.     Law enforcement field-tested a sample of the substance that CW2 purchased from CADET and it tested positive for the presence of heroin.

June 25, 2014 Controlled Purchase

48.     On or about June 24, 2014, at approximately 7:43 p.m., CW2 called CADET on the Cadet Facility. That call was recorded. In response to CW2's request to purchase heroin the following day, CADET stated: "we'll talk. We're gonna talk first tonight." CADET then stated, "matter fact, I don't think I'm gonna have time. I'll talk to you tomorrow."

49.     On or about June 25, 2014, at approximately 1:41 p.m., CADET called CW2 from the Cadet Facility. That call was recorded. CADET asked CW2, "where you at?" CW2 responded that CW2 was about to go to a location in Ocean Township, New Jersey. CADET told CW2, "go ahead, do what you gotta do" and that CADET would talk to CW2 and that they would meet later. Soon thereafter, law enforcement provided CW2 with an audio recording device to record the transaction.

50.     Law enforcement established surveillance in the area of the location where CW2 told CADET that CW2 would be. At approximately 4:05 p.m., CADET called CW2 and told CW2, "come out right now, don't take a long time." At approximately the same time, law enforcement observed CADET arrive in the BMW that he was driving on June 3, 2014. After

CADET arrived, CW2 entered the BMW.  During the meeting, CW2 asked CADET if he had "the dog food," meaning heroin, and CADET responded "yeah, I do."  CW2 told CADET that CW2 needed 40 or 50 bricks of heroin.  Thereafter, CADET handed CW2 four small brown cardboard boxes containing 40 bricks of heroin.[2]  The glassine bags were stamped with the word "Newport" in green lettering.

51.     While still in the BMW, CADET proceeded to counsel CW2 on how to make "real money."  CADET told CW2 to hire street level dealers to sell directly to "fiends."  CADET further told CW2 that CW2 could easily make $1,000 profit off of each brick of heroin.  CADET also told CW2 to travel to southern states like South Carolina and sell heroin there because it was easy to make money there.  The entirety of the controlled purchase was audio recorded.

52.     Law enforcement field-tested a sample of the substance that CW2 purchased from CADET and it tested positive for the presence of heroin.

53.      Subsequent to the meeting with CADET, law enforcement provided CW2 with $7,000 as payment for the 40 bricks of heroin that CADET gave CW2.  Later that evening, CW2 gave CADET the $7,000 as payment for the heroin.

July 11, 2014 Controlled Purchase

54.     On or about July 10, 2014, at approximately 6:10 p.m., CW2 called CADET on the Cadet Facility.  That call was recorded.  On the call, CW2 told CADET, "real talk, tomorrow afternoon, I'm going to come purchase, I'm going to come check you."  In response, CADET said, "alright."

55.     On or about July 11, 2014, at approximately 2:26 p.m., CW2 called CADET on the Cadet Facility and arranged to meet CADET at a location in Ocean Township to purchase heroin.  That call was recorded.  Prior to meeting with CADET, law enforcement provided CW2 with $7,000 to purchase heroin from CADET and an audio recording device to record the transaction.

56.     At approximately 5:37 p.m., CADET called CW2 from the Cadet Facility and informed CW2 that he had arrived at the meet location.  Shortly thereafter, CW2 went to the location and entered CADET's vehicle.  Once inside, CADET handed CW2 four small brown cardboard boxes containing forty bricks of heroin.  CW2 gave CADET $7,000 as payment for the heroin.  The glassine bags were stamped with the words "Street Doctor" in black lettering. The entirety of the controlled purchase was audio recorded.

---

[2] CW2 later told law enforcement that when he first approached the BMW, the trunk of the car was open and CW2 observed what CW2 believed was approximately two kilograms of packaged heroin in the trunk hidden underneath a blanket.  Specifically, CW2 observed numerous small cardboard boxes in the trunk of the BMW.  When CW2 has purchased heroin from CADET, the heroin was often packaged in small cardboard boxes.  Each box usually contained ten bricks of heroin.

57.     Law enforcement field-tested a sample of the substance CW2 purchased from CADET and it tested positive for the presence of heroin.

## Court-Authorized Wiretaps and Other Evidence Reveals the Scope of the Conspiracy

58.     Between in or about June 2014 and in or about October 2014, the United States District Court for the District of New Jersey, entered orders authorizing electronic surveillance of over the Cadet Facility and a cellular telephone used by SMITH (hereinafter, the "Smith Facility").[3]  Telephone calls intercepted over those phones further revealed the scope of the Cadet DTO's illegal operations, including the identities of its narcotics distributors and other co-conspirators.  CADET frequently communicated with his co-conspirators and others about the packaging, sale, and distribution of heroin and other narcotics.  Some of those communications and other related evidence are described below.[4]

59.     The descriptions of the intercepted calls discussed in this Affidavit are based on summaries of the conversations.  In the descriptions, my comments regarding the nature of the calls are based on my knowledge, training, experience, and that of other law enforcement agents with whom I have spoken, and the results of the investigation to date.

60.     For example, on or about June 25, 2014, at approximately 7:01 p.m., SIMON called the Cadet Facility and spoke to CADET.  During the call, CADET told SIMON that someone was "coming for two small ones. I'm gonna tell him to hold on.  I'm about to go to the source real quick." Based on the context of this and other conversations, CADET told SIMON someone was going to meet SIMON to purchase two bricks of heroin.  In stating that he was "about to go to the source," CADET was likely referring to the location where he stashes the narcotics.

61.     On or about July 3, 2014, at approximately 10:14 p.m., SMITH placed a call over the Smith Facility to the Cadet Facility and spoke to CADET.  During the call, CADET told SMITH, "I've been here," and SMITH responded, "she said she was pulling up, you was [U/I] she seen the white truck pulling off." CADET stated, "yeah, she gonna have to wait," and SMITH responded, "yo, what is it with you, you can't sit still for a few minutes?" CADET responded, "I, because I got to come back because I ain't. I can't fit two parties I only got that one party for her. I was trying, I was trying to tell everybody I got to go there and I might have both of the parties for her." Based on the context of this and other conversations, SMITH likely called CADET on behalf of a customer because the customer was supposed to meet CADET to purchase heroin, but CADET left the meet location prior to the meet.  CADET appeared to explain to SMITH, in coded language, why he did not stay at the location.

---

[3] The interception of wire communications over the Cadet Facility commenced on or about June 24, 2014.  The interception of wire communications over the Smith Facility commenced on or about August 22, 2014.
[4] Some of the conversations intercepted over the Cadet Facility and the Smith Facility took place in both Haitian Creole and English.  The Haitian Creole portions of the conversations have been translated into English.

62. On or about July 28, 2014, at approximately 12:59 p.m., CADET placed a call over the Cadet Facility to SIMON. During the call, CADET asked SIMON, "how much do you have left in the girls?" SIMON responded, "you still have all the girls I gave you [U/I] [5]the other day and that is it. The rest is still sitting here." CADET then asked, "all 12, the 13?" and SIMON responded affirmatively. CADET then stated, "alright, if you want to go see Brian, give me five, five for it. He wants five, so you'll give him five at seven five." SIMON asked, "I'm giving him five bags?" and CADET stated, "yeah, five in the girls. You'll give it at 75." Later in the call, CADET stated, "I told him if he gets 10, I'll drop the price to 70 and if he gets 20, I'll drop it to 55." Based on the context of this and other conversations, CADET asked SIMON how many bricks of heroin he had left. Based on the experience of law enforcement officers working on this investigation, the term "girls" is a common code word for heroin. CADET then instructed SIMON to give a person named "Brian" five bricks of heroin at a price of $750. CADET told SIMON that he informed Brian that if he purchased more bricks of heroin, CADET would reduce the price.

63. On or about August 3, 2014, at approximately 6:55 p.m., SIMON called the Cadet Facility and spoke to CADET. During the call, CADET asked, "you will be good to all the way through Thursday right?" and SIMON replied, "hell no." CADET told SIMON, "you gotta stop sharing with him. You heard me?" SIMON asked, "why you say that?" and CADET stated, "we gotta stop sharing with him, just give him a small amount, he can work his way up there." SIMON then replied, "alright." Based on the context of this and other conversations, CADET asked SIMON whether SIMON had enough narcotics, likely heroin, to last him through Thursday of that week. SIMON told CADET that he did not have enough and CADET proceeded to tell SIMON to stop sharing his narcotics with an unknown male, who is likely a lower level drug dealer.

**JOSEPH**

64. Intercepted wire communications revealed that JOSEPH obtained heroin from CADET and distributed it to others on numerous occasions.

65. On or about July 8, 2014, at approximately 11:06 p.m., JOSEPH called the Cadet Facility and spoke to CADET. During the call, JOSEPH stated, "Yo, I forgot to tell you if it's 38 he's gonna take five." CADET then asked, "Who?" and JOSEPH stated, "Son." JOSEPH further stated, "You gonna make 950 off each.... he's making a deal with you, he don't wanna stretch himself too thin." CADET then stated, "Oh, tell him go ahead and take it from me instead man" and "I shoulda never say nothing to him." Based on context of this and other conversations, JOSEPH informed CADET that an individual was willing to purchase five bricks of heroin from CADET at a certain price and would provide CADET a cut of the proceeds. JOSEPH related to CADET that the individual stated that CADET would make $950 per brick. CADET expressed his hesitation to enter into such an arrangement with the individual.

---

[5] [U/I] denotes a portion of the telephone call that was unintelligible and therefore unable to be transcribed.

66.     On or about July 15, 2014, at approximately 10:53 a.m., JOSEPH called the Cadet Facility and spoke to CADET.  During the call, JOSEPH told CADET, "I need half in the good ones…he's gonna give you the money, what's his name JB.  He gonna pay you straight up." CADET then stated, "He still owe.  Yo ask him what's up with the money he owe me."  JOSEPH responded, "I let him know but he's gonna pay you that one straight up."  In the background of the telephone conversation between CADET and JOSEPH, an individual is heard saying "Gotti know [U/I] I got him."  JOSEPH then stated to CADET, "call me when you coming down so I can find a way to get in contact with him."  CADET then stated, "I already know how to get in contact with him."  JOSEPH then spoke to the individual in the background and confirmed with CADET when he would be home in order to meet up with the individual.  Based on context of this and other conversations, JOSEPH called CADET and placed an order for one of his customers, "JB," possibly the same individual JOSEPH referred to in the July 8, 2014 call summarized above.  JOSEPH told CADET that JB was ready to purchase heroin from CADET. CADET asked about the money that JB owed him and JB stated that CADET knows JB will pay CADET the money that is owed.

67.     On or about July 15, 2014, at approximately 11:24 a.m., approximately 30 minutes after the call summarized above, CADET placed an outgoing call to JOSEPH.  During the call, JOSEPH stated, "Yo this nigga um… Spank told him not to take it" and CADET responded, "Alright."  JOSEPH further stated, "Yo bring a sample to give him, I think the same thing is still the same shit."  CADET responded, "No they not.  They don't know that."  JOSEPH then stated, "Cause I ain't give him the first one I see, I didn't show him that… the bottle when I got the garbage."  CADET then told JOSEPH to have his customer contact two other individuals for the sample.  JOSEPH then stated that he would try to find SIMON.  Based on context of this and other conversations, JOSEPH's customer, JB, decided that he no longer wanted to purchase heroin from CADET based on another individual's advice.  JOSEPH then asked CADET to bring a sample of heroin for JOSEPH's customer and CADET told JOSEPH to contact two other people in order to possibly obtain a sample.  When JOSEPH referred to "the garbage," he was likely referring to the poor quality heroin that several customers complained to CADET about during that time period.  See ¶¶ 83-86 below.

68.     On or about July 15, 2014, at approximately 12:00 p.m., JOSEPH called the Cadet Facility and spoke to CADET.  During the call, the following conversation took place, in part:

JOSEPH:      Yeah, um where is it?

CADET:       Listen.  Go in the green pants.  Check in the pockets, check in the pockets, give it to him first.  If he like it, just turn back around, just go grab it.

JOSEPH:      Say that again.

CADET:       The green pants.

             [Voices overlap]

CADET:       Huh?

16

JOSEPH:      Is it in the trunk or inside the car?

CADET:      In the trunk.  You don't see no green pants?

JOSEPH:      Hold on.  Yeah, I see the green pants.

CADET:      Take, take, take, take, take... check inside the pockets.

JOSEPH:      Say that again?

CADET:      Check inside the pockets.

JOSEPH:      That's all you have, you don't have any big ones with you?

CADET:      I have big ones with me.  I have the halves.  It's inside the Gucci bag.

JOSEPH:      I need a whole.  I need, I need a big one, I need a big one.  I need a quarter in the ones that are not good, and an O in the ones that are not good.

CADET:      I don't think... I'm tryna think if I have quarters in the ones that are no good.  Uh... There are the [U/I] you, you could tell how they look like...

JOSEPH:      Huh?

CADET:      There's a quarter... There's a quarter in the Gucci bag man.

<div align="center">***</div>

JOSEPH:      I need, I need one of the big ones, so I will take the one that's in the car.  I see a big one in the car, so I will take that, I'll take a big one, and I need a quarter; a quarter in the ones that aren't good and an O in the ones that aren't good.

CADET:      What's a quarter?  Quarter that's not good?

JOSEPH:      Quarter, quarter, quarter...

<div align="center">***</div>

CADET:      Quarter... When you say quarter [U/I] is it four?

JOSEPH:      Yeah, four.

CADET:      Yeah, I'ma bring, I'ma bring that down.

JOSEPH:      Aight. When you coming down, come down with a quarter, and an O in the ones
             that are no good.

                                         ***

JOSEPH:      Just bring five, five O in total.

The investigation has revealed that the Cadet DTO has used various vehicles parked at an
apartment complex in Ocean Township, New Jersey as to stash narcotics. CADET's co-
conspirators often retrieved heroin from those stash vehicles and left payment for the heroin
within. Based on context of this and other conversations, JOSEPH, speaking to CADET in code,
was searching for a certain quantity of heroin inside one of the stash vehicles and CADET tried
to explain to JOSEPH where the heroin was located. JOSEPH specifically asked for a portion of
the heroin that was "not good," meaning the poor quality heroin. JOSEPH asked CADET to
bring a certain quantity of heroin to JOSEPH.

        69.     On or about July 15, 2014, at approximately 12:08 p.m., CADET placed an
outgoing call to JOSEPH. During the call, JOSEPH told CADET, "Bring one when you come
down here. Break Bread put some money in the car for you." CADET responded, "Aight."
JOSEPH further told CADET, "When you come, bring five" and "put one separately, the other
four together." CADET then responded, "I got you." Based on context of this and other
conversations, JOSEPH asked CADET to bring five bricks of heroin with four bricks packaged
together and one brick packaged separately. JOSEPH also told CADET that SIMON left money
in the stash car for CADET.

        70.     On or about July 21, 2014, at approximately 2:25 p.m., JOSEPH called the Cadet
Facility and spoke to CADET. During the call, JOSEPH told CADET, "Tell Break Bread the
guy across the street from the um gambling spot, is gonna be ready for him around three or four
o'clock." JOSEPH further stated, "he gonna have his money for him. He can give the guy the
same thing again." When CADET asked, "who?," JOSEPH responded, "The guy, the guy. He
know, he know. Just tell Break Bread that kid across... Buddah ummm Gator umm lil' brother
is ready for him. He gonna know." Based on context of this and other conversations, JOSEPH
told CADET that one of JOSEPH's customers was ready to make a heroin purchase from
SIMON. JOSEPH told CADET to inform SIMON that the customer was ready to meet SIMON
and had money for him. JOSEPH informed CADET that SIMON would know who JOSEPH
was referring to.

        71.     On or about July 22, 2014, at approximately 11:29 p.m., CADET placed an
outgoing call to JOSEPH. During the call, JOSEPH asked, "Yo, I need, I need... you gonna
have a half with you tonight?" CADET asked "For who?" and JOSEPH responded, "I have, I
owe a few people a few, a few grams man." CADET told JOSEPH, "you gonna have to wait for
tomorrow." JOSEPH then told CADET, "That's cool. I'll put the money, I'll put h money at the
spot O told you. It's gonna be a few hundred extra on it." Based on context of this and other
conversations, JOSEPH asked CADET to bring him a quantity of heroin because JOSEPH owed
some of his customers some grams of heroin. JOSEPH told CADET that he would leave the
money, including some extra, at a location where he and CADET had previously discussed.

**EL-BEY**

72.     Intercepted wire communications revealed that EL-BEY obtained heroin from CADET and SIMON and distributed it to others on numerous occasions.

73.     On or about August 4, 2014, at approximately 10:39 a.m., EL-BEY called the Cadet Facility and spoke to CADET.  During the call, EL-BEY asked, "did you call Break Bread last night?"  CADET responded that he did call SIMON, but "he was not on the block."  EL-BEY responded, "Oh … shit you think he up know?" and CADET responded "I don't know."  EL-BEY then stated, "Call Break Bread and see if he's around, man" and CADET said, "Alright."  Based on the context of this and other conversations, EL-BEY was trying to find SIMON in order to purchase heroin.  CADET informed EL-BEY that SIMON was not available the night before to sell heroin to EL-BEY.  CADET informed EL-BEY that he would reach out to SIMON on EL-BEY's behalf.

74.     On or about August 5, 2014, at approximately 5:45 p.m., CADET placed a call over the Cadet Facility to EL-BEY.  During the call, CADET stated, "I'ma need two favors from you.  You can go to Staples for me?"  EL-BEY asked, "for what?" and CADET responded, "You know…get me some tape."  CADET stated, "maybe like two, three."  EL-BEY asked, "get the Scotch one?" and CADET responded, "yeah, get the paper brand."  CADET further told EL-BEY, "And you meet me over there by, you can meet me over there by um…Scrappy, Scrappy house."  CADET also stated, "Well not by Scrappy, Scrappy house you know, towards the other way."  EL-BEY told CADET, "Yeah I'm about to do that" and CADET instructed EL-BEY, "You better go now, you better go now."  Based on the context of this and other conversations, CADET asked EL-BEY to go buy some tape for him to be used in packaging heroin in glassine baggies.  CADET further told EL-BEY to meet him at a location where CASIMIR, whose alias is "Scrappy," would be.  The investigation has revealed that CASIMIR stores and packages heroin for the Cadet DTO at various locations, including a stash house in Asbury Park.

75.     On or about August 26, 2014, at approximately 7:58 p.m., CADET placed a call over the Cadet Facility to EL-BEY.  During the call, CADET asked EL-BEY, "how you gonna take the [U/I] from me, man?"  EL-BEY asked, "the what?" and CADET stated, "to measure it."  EL-BEY responded, "I didn't take it.  Word is life, I didn't take it."  EL-BEY further stated, "I didn't touch that thing, you gave it to Break Bread," to which CADET responded, "I don't think so."  EL-BEY then stated, "You gave it to Break Bread.  I guarantee if you got it call him."  EL-BEY further stated, "I told you [U/I].  I went out and got my own."  CADET then stated, "I think I'm gonna need yours, I'm gonna call him real quick."  Based on the context of this and other conversations, CADET asked EL-BEY why he took the scale that CADET uses to measure narcotics.  EL-BEY responded that he did not have the scale and stated that CADET gave the scale to SIMON.

76.     On or about August 26, 2014, at approximately 8:00 p.m., two minutes after the call with EL-BEY, CADET placed a call over the Cadet Facility to SIMON.  During the call, CADET asked SIMON, "yo, I never gave you the balance?"  SIMON responded, "what you say?" and CADET repeated, "Balance.  I never gave you the balance?"  SIMON replied, "the

balance, nah. You left it in the bag." CADET then said, "I don't see it" and SIMON stated, "I don't know what you did with it." CADET then stated, "I gotta look in there one more time. Alright." Based on the context of this and other conversations, CADET, after EL-BEY told him that SIMON had the scale, likely called SIMON and asked whether SIMON had his scale. SIMON told CADET that he did not have it.

77.     On or about September 2, 2014, at approximately 3:21 p.m., EL-BEY called the CADET facility and spoke to CADET. During the call, CADET asked EL-BEY, "remember what I gave you in the kitchen?" and EL-BEY responded, "Yeah." CADET then stated, "You never tell me was that." EL-BEY responded, "It was decent. It's alright, for for a number you know." CADET then asked, "What number?" and EL-BEY responded, "For what you talking about." CADET then responded, "I said two, five" and EL-BEY responded that he disagreed with the price CADET quoted. CADET then stated, "Oh, oh, oh just make that off it" and EL-BEY stated, "yeah." Based on the context of this and other conversations, CADET asked EL-BEY about narcotics that he and EL-BEY previously discussed. EL-BEY told CADET that the product was decent and he would be willing to purchase it for a certain price.

78.     On or about September 3, 2014, at approximately 2:05 p.m., CADET placed a call over the Cadet Facility to EL-BEY. During the call, EL-BEY asked CADET where he was and CADET responded, "I'm about to come get you right now." EL-BEY then asked, "You bringing the what's name?" and CADET stated, "yeah, I'm on the back road; I'm on the back road." CADET then told EL-BEY, "You got, you got um, bring that with you." EL-BEY responded, "Man, I already got, I already know, man." Based on the context of this and other conversations, CADET was likely on his way to meet EL-BEY to deliver heroin. In stating that he was "on the back road," CADET informed EL-BEY that he was attempting to evade law enforcement by not driving on the main roadways. As detailed in ¶¶ 113-120 below, the day before this phone call, law enforcement detained CANALES and COLLINS at SMITH's residence and subsequently seized a quantity of heroin from SMITH's vehicle. As a result of the events of September 2, 2014, CADET told EL-BEY that he was being extra cautious in his movements.

## MATTHEWS and CASIMIR

79.     Intercepted wire communications revealed that MATTHEWS obtained heroin from CADET and distributed it to others on numerous occasions. Intercepted wire communications also revealed that CASIMIR stored and packaged quantities of heroin for the Cadet DTO.

80.     On or about July 2, 2014, at approximately 10:37 a.m., MATTHEWS called the Cadet Facility and spoke to CADET. During the call, MATTHEWS asked CADET, "When are we going? When are we going to be ready?" CADET responded that he was just waking up at the time. MATTHEWS asked, "Okay, so probably in the next two hours?" and CADET responded, "something like that." MATTHEWS further asked CADET, "Did you get any of the other, the green?" and CADET responded that he might have it "today or tomorrow." MATTHEWS told CADET, "Just call me when you're ready." Based on the context of this and other conversations, MATTHEWS called CADET in order to arrange a purchase of heroin. When MATTHEWS referred to "the green," she was likely referring to one of CADET's heroin stamps named "Newport," which at the time was green in color.

81.     On or about July 2, 2014, at approximately 1:19 p.m., CADET placed a call over the Cadet Facility to MATTHEWS. During the call, CADET told MATTHEWS to "start heading by Shop Rite." MATTHEWS then asked, "In Lakewood?" and CADET responded, "Yeah." After some discussion regarding a previous purchase of narcotics, MATTHEWS told CADET, "Just bring me the whole fifteen, like normal." Based on the context of this and other conversations, CADET instructed MATTHEWS to meet him near Shop Rite in Lakewood, New Jersey in order to complete the heroin transaction. MATTHEWS told CADET to bring her 15 bricks of heroin, which is likely her usual order of heroin from CADET.

82.     Subsequent to the intercepted communications between CADET and MATTHEWS on July 2, 2014, at approximately 4:00 p.m., law enforcement established surveillance in the area of 1700 Madison Avenue in Lakewood, New Jersey, which is a shopping plaza that includes a Shop Rite supermarket. Soon after arriving in the area, surveillance observed a Hyundai Elantra arrive at the shopping plaza. Law enforcement observed MATTHEWS driving the vehicle. At approximately 4:25 p.m., law enforcement observed CADET pull into the shopping plaza driving a Nissan. CADET parked a few cars away from MATTHEWS. Law enforcement observed CADET exit his vehicle and enter the front passenger side door of MATTHEWS' vehicle. Law enforcement observed CADET and MATTHEWS engage in a conversation. Soon after, CADET exited MATTHEWS' vehicle and walked back to his vehicle. CADET opened the front driver's side door of the Nissan, leaned inside, and reached for something. CADET then walked back to MATTHEWS' car and entered through the passenger side door. Law enforcement then observed what appeared to be MATTHEWS rummaging through her purse. CADET and MATTHEWS engaged in conversation for approximately 15 minutes. At approximately 4:40 pm, CADET exited MATTHEWS' vehicle and entered the Nissan. Cadet then departed the area. Based on the intercepted wire communications between CADET and MATTHEWS, it appears that CADET and MATTHEWS engaged in the heroin transaction they arranged on the calls.

83.     On or about July 14, 2014, at approximately 2:01 p.m., CADET placed a call over the Cadet Facility to MATTHEWS. During the call, MATTHEWS told CADET that she has what she owes him, but that she has to "hand it back" because "it was making them fucked up." CADET told MATTHEWS that he is going to "check it out" because she is "the only one." MATTHEWS told CADET it "is becoming a problem now" because she constantly has to bring it back. Based on the context of this and other conversations, MATTHEWS told CADET that the heroin she purchased from him made her customers sick. MATTHEWS further told CADET that the heroin is starting to be a problem because it is making people sick, so she is constantly bringing the narcotics back to CADET. CADET told MATTHEWS that she is the only one that has complained, so he will check with other customers to see if it is making other people sick.

84.     On or about July 15, 2014, at approximately 9:17 a.m., CADET placed a call over the Cadet Facility to a male, H.B. During the call, CADET asked H.B., "is it too strong?" H.B. responded, "no, it's not too, no it's not too, it's like perfect, it's like perfect" and "that other shit ain't wear off yet." H.B. told CADET, "you can work on it a little more if you want." CADET then asked, "is it too overpower[ing]?" In response, H.B. stated, "no, it's not too overpowering, but I'm saying, it lasts for a long ass time." H.B. further told CADET, "if you wanted to, just to

you know, just stretch it a little further, you could, like, like, uh, 25% more." CADET responded, "I got you." Based on the context of this and other conversations, CADET called H.B., who was likely one of his customers or "drug testers," to inquire as to whether his recent batch of heroin was too strong, in relation to CADET's telephone call with MATTHEWS on July 14, 2014. H.B. told CADET that the product was a bit too strong and that CADET should cut the heroin by another 25%.

85.     On or about July 15, 2014, at approximately 9:26 a.m., minutes after his call with H.B., CADET placed a call over the Cadet Facility to H. JEAN-BAPTISTE. During the call, CADET told H. JEAN-BAPTISTE, "Let me talk… umm let me talk to uh Scrappy." When CASIMIR got on the phone, CADET asked CASIMIR, "You finished?" and CASIMIR said that he was not finished. CADET then instructed CASIMIR to "take a bag, and put everything together" and to "take a bag, and shake it inside of it. Put all and mix together." CADET told CASIMIR "It's too strong. The stuff is too strong man." CADET further told CASIMIR to "Do it twice. Shake it in the bag, then mix it so it can be spread out evenly; then un-tie it, to do it with your hands." In response to CADET's instructions, CASIMIR stated, "aight." Based on the context of this and other conversations, CADET told CASIMIR to re-cut the heroin to increase the quantity and therefore decrease its purity because the current batch was too strong. CADET instructed CASIMIR to do that as a result of CADET's phone calls with MATTHEWS on July 14, 2014 and H.B. on July 15, 2014 during which the potency of the heroin sold by CADET was discussed.

86.     On or about July 15, 2014, at approximately 10:42 a.m., MATTHEWS called the Cadet Facility and spoke to CADET. During the call, the quality of CADET's batch of heroin was discussed again. CADET asked MATTHEWS, "it's too overpowered?" and MATTHEWS responded, "No, it's bad. It's bad, like, uh, bad. Like, it shouldn't even be outside on the street." Based on the context of this and other conversations, MATTHEWS again explained to CADET that the quality of his recent batch of heroin was poor.

## GILLES

87.     Intercepted wire communications revealed that GILLES obtained heroin from CADET and SIMON and distributed it to others on numerous occasions.

88.     For example, on or about June 27, 2014 at approximately 3:03 p.m., CADET placed a call over the Cadet Facility to GILLES. At the time, CADET was in Los Angeles, California and returned to New Jersey on or about Sunday, June 29, 2014. During the call, CADET told GILLES, "[i]f you want old boy to come by, I can … Or I can do this, just unlock your door. Tell him drop it off, and I'll just see you Sunday." GILLES stated, "I need something less because I gotta pay a couple bills." CADET responded, "Or I can just give it to you. You ain't gotta see him, I can just tell him drop it off and I'll tell you it's downstairs, and I'll see you Sunday." GILLES then stated, "I need it now." CADET responded by confirming "[i]t'll be less" and that "it ain't gonna be too long." CADET then asked, "two?" and GILLES responded "three." CADET told GILLES to unlock her door and CADET would "tell him throw it in there." GILLES then responded, "it's okay, I'll just give him the money." Based on context of this and other conversations, GILLES was negotiating a purchase of three bricks of heroin

22

from CADET and CADET advised GILLES that he would have someone drop off the heroin to her.

89.     On or about June 27, 2014 at approximately 3:05 p.m., minutes after the previous call summarized above, CADET placed a call over the Cadet Facility and spoke to SIMON. During the call, CADET told SIMON, "take three, umm, three to the girl." CADET further told SIMON to "[l]eave three for the girl who has the same car like me." SIMON then asked, "how much should I give her?" CADET responded, "three." SIMON then stated, "she is giving me money right?" and CADET confirmed that she was. CADET then informed SIMON that "[he] gave it to her at $1.50." Based on the context of this and other conversations, CADET directed SIMON to deliver three bricks of heroin to GILLES at a price of $150 per brick.

90.     On or about June 30, 2014 at approximately 5:55 p.m., CADET placed a call over the Cadet Facility to GILLES. During the call, CADET told GILLES that he "forgot to let [her] know that it's not exactly like the same thing because I did, I got more out of it." GILLES asked CADET about a lower price and CADET responded that the price is lower. CADET stated, "I'm just letting you know ahead of time. If you don't like it, you already know how I roll." Based on the context of this and other conversations, CADET informed GILLES that the purity of the heroin in her next purchase will not be the same as previous batches of heroin because the heroin was cut in such a manner to yield more product. CADET also informed GILLES that the price would be lower because the quality is not the same as her previous purchases of heroin.

91.     On or about July 5, 2014, at approximately 1:22 p.m., CADET placed a call over the Cadet Facility to GILLES. During the call, CADET told GILLES, "[t]he one he got, I left it in the car and it was so hot, it's on the bad so the numbers are dropped down. You want it? I'll drop the numbers down to 120." GILLES then asked CADET, "From one to ten, what is it?" CADET responded, "It be the same, it just stuck on the, um, because of the heat." GILLES then asked, "Oh, it got wet?" CADET responded, "It didn't get wet, the moister is like," at which point GILLES cut CADET off and stated, "It sweated." CADET responded, "It didn't sweat that much, just a little bit." GILLES then asked, "The same ones though?" and CADET replied, "It's the same one." Based on the context of this and other conversations, CADET told GILLES that he had heroin to sell, but it was damaged because it was left in a car and exposed to high temperatures. When CADET told GILLES, "it just stuck," he was likely referring to the heroin sticking to the glassine bags in which it was packaged. Furthermore, CADET informed GILLES that he lowered the price per brick of heroin to $120 because the heroin was damaged.

92.     Minutes after the call summarized above, on or about July 5, 2014, at approximately 1:28 p.m., CADET placed a call over the Cadet Facility to SIMON. During the call, CADET asked SIMON, "How many do you have?" and SIMON responded, "How many do I have? I don't know. I'm coming from the mall. I'll count them when I arrive." CADET told SIMON, "For the girl, yes, bring five." SIMON responded, "Nah, I only have the stuff that's no good." CADET told SIMON, "Yeah, yeah, you can bring five." Based on the context of this and other conversations, CADET directed SIMON to deliver five bricks of heroin to GILLES. When SIMON stated that he only had "the stuff that's no good," he was likely referring to the heroin that was damaged by exposure to the heat that CADET and GILLES discussed in the previous call.

93.     On or about July 8, 2014, at approximately 3:23 p.m., GILLES called the Cadet Facility and spoke to CADET.  During the call, GILLES asked CADET, "You can do that for me?"  CADET asked, "The usual?" and GILLES told CADET, "Yeah, matter of fact, yeah the usual."  GILLES then spoke to an unidentified individual in the background and asked that person, "Should I get more?"  GILLES then stated to CADET, "If I need more, I'll just call you back."  Based on the context of this and other conversations, GILLES placed an order with CADET for her usual quantity of heroin.

94.     On the same date, July 8, 2014 at approximately 3:26 p.m., CADET placed a call over the Cadet Facility to SIMON.  During the call, CADET told SIMON, "I said she needs five. And when she gives you the money, take out sixty dollars."  SIMON responded, "How much am I giving?" and CADET replied, "Five."  Based on the context of this and other conversations, CADET directed SIMON to deliver five bricks of heroin to GILLES.

95.     On or about July 14, 2014, at approximately 5:03 p.m., CADET placed a call over the Cadet Facility to GILLES.  During the call, GILLES said "what's up, you good?" and CADET replied "yeah."  GILLES then told CADET, "alright, well, um, four."  In response, CADET stated, "I'm going to send my brother over."  At approximately 5:04 p.m., CADET placed a call over the Cadet Facility to SIMON.  During the call, CADET told SIMON, "you know the girl."  SIMON then told CADET, "you still haven't told me anything," and CADET responded, "four."  Based on the context of these and other conversations, GILLES ordered four bricks of heroin from CADET during the first call and CADET told GILLES he would send SIMON over to deliver the heroin to her.  CADET then called SIMON and told him to deliver four bricks of heroin to GILLES.

96.     On or about August 4, 2014, at approximately 11:24 a.m., CADET placed a call over the Cadet Facility to GILLES.  During the call, GILLES asked CADET, "you around?" and CADET responded, "yeah not yet, I'm gonna call my brother to come down."  GILLES then stated, "oh okay, well um, I need two" and CADET responded, "alright, I'm gonna let him know that."  GILLES then responded, "okay, call me when you speak to him."  Based on the context of this and other conversations, GILLES called CADET and placed an order for two bricks of heroin.  CADET told GILLES that he would contact SIMON so that SIMON could deliver the heroin to GILLES.

97.     On or about August 4, 2014, at approximately 11:26 a.m., two minutes after CADET's call to GILLES, CADET placed a call over the Cadet Facility to SIMON.  During the call, CADET told SIMON, "go check, go check with the girl," and SIMON stated, "yeah, she just called me."  CADET then asked, "she called you?" and SIMON said, "yeah."  Based on the context of this and other conversations, CADET told SIMON to contact GILLES because she placed and order for heroin.  On the call, SIMON told CADET that GILLES had just called him, so it is likely that GILLES placed her order for heroin directly with SIMON.

98.     On or about August 8, 2014, at approximately 12:59 p.m., GILLES called the Cadet Facility and spoke to CADET.  During the call, GILLES asked CADET, "can you bring one?" and CADET responded, "alright, let me see where my brother at."  Based on the context of

this and other conversations, GILLES called CADET and placed an order for one brick of heroin.  In response, CADET told GILLES that he would locate SIMON, who he often refers to as his "brother," so that SIMON could fill the order.

99.  On or about August 8, 2014, at approximately 1:54 p.m., GILLES called the Cadet Facility and spoke to CADET.  During the call, GILLES asked CADET, "what up bro?" and CADET stated, "I'm still trying to get in contact with him.  It look like I'm gonna have to come see you."  GILLES then stated, "alright, bring three."  Based on the context of this and other conversations, GILLES called CADET for an update on the order she placed in the previously summarized call.  CADET informed GILLES that he had been unsuccessful getting in contact with SIMON, so CADET might have to bring the heroin to GILLES himself.  GILLES then increased her initial order of one brick of heroin to three bricks of heroin.

100.  On or about August 8, 2014, at approximately 2:46 p.m., CADET placed a call over the Cadet Facility to SIMON.  During the call, CADET asked SIMON, "where you at?" and SIMON responded, "I'm on Monroe."  CADET told SIMON, "go see the girl, go see the girl for three."  SIMON then stated, "alright" and asked "she is ready right now, right?" and CADET responded, "yeah."  Based on the context of this and other conversations, CADET directed SIMON to go sell three bricks of heroin to GILLES.

**BRAITHWAITE-LOVET**

101.  Intercepted wire communications revealed that BRAITHWAITE-LOVET obtained heroin from CADET and SIMON and distributed it to others on numerous occasions.

102.  On or about July 4, 2014, at approximately 2:02 p.m., BRAITHWAITE-LOVET called the Cadet Facility and spoke to CADET.  During the call, BRAITHWAITE-LOVET stated, "hey, this is Shay on 3rd."  CADET asked, "who?" and BRAITHWAITE-LOVET responded, "Shay.  E told me to call you."  CADET then stated, "you gotta give me some time." BRAITHWAITE-LOVET responded, "Alright.  Just call me when you get down here."  Based on the context of this and other conversations, BRAITHWAITE-LOVET told CADET that SMITH, whose alias is "E," told her to call CADET.  Based on the call and other information obtained during the course of the investigation, SMITH referred BRAITHWAITE-LOVET to CADET to purchase heroin.

103.  On or about July 20, 2014, at approximately 3:58 p.m., BRAITHWAITE-LOVET called the Cadet Facility and spoke to CADET.  BRAITHWAITE-LOVET asked CADET, "is your brother around?" and CADET responded "yeah."  BRAITHWAITE-LOVET then stated, "Alright, I need to come see him, I don't want him to come to me because I just feel real weird." CADET responded, "he's on Monroe and Ridge."  Based on the context of this and other conversations, BRAITHWAITE-LOVET called CADET and indicated that she wanted to make a purchase of heroin.  CADET directed her to meet SIMON in the area of Monroe Avenue in Asbury Park where SIMON resides.

104.  On or about July 20, 2014, at approximately 4:29 p.m., CADET placed a call over the Cadet Facility to BRAITHWAITE-LOVET.  During the call, BRAITHWAITE-LOVET told CADET, "I ain't go over there, I got the baby.  I'm just waiting for somebody to come get the

baby from me." CADET then told BRAITHWAITE-LOVET, "He out there waiting." In response, BRAITHWAITE-LOVET stated, "Okay, let me see if I can drop her to my cousin real quick. I don't want to have her with me." BRAITHWAITE-LOVET then asked, "What's his name? I don't even know his name." CADET responded, "Break Bread." Based on the context of this and other conversations, BRAITHWAITE-LOVET told CADET that she did not go purchase the heroin from SIMON because she had a baby with her and did not want to go with the baby. During the call, BRAITHWAITE-LOVET asked CADET for SIMON's name and CADET provided her with SIMON's alias, Break Bread.

105.    On or about July 28, 2014, at approximately 3:56 p.m., BRAITHWAITE-LOVET called the Cadet Facility and spoke to CADET. During the call, CADET asked BRAITHWAITE-LOVET, "you want my brother to come?" and BRAITHWAITE-LOVET subsequently asked, "you good with him?" CADET told BRAITHWAITE-LOVET, "Yeah, I'm about to find out" and "I'ma tell him to stop over there." CADET further told BRAITHWAITE-LOVET, "I'm about to call him up anyway." Minutes after that call, at approximately 3:59 p.m., CADET placed a call over the Cadet Facility to SIMON. During the call, CADET asked SIMON, "are you finished?" SIMON responded, "no, you can bring the stuff." CADET stated, "no, not that, not that. I am asking are you finished? You because I am gonna come by 3rd. I need you." SIMON responded, "I'm not done," and CADET stated, "I'm going to be on 3rd, I'm gonna call you back. Bring one with you." Based on the context of these and other conversations, BRAITHWAITE-LOVET called CADET because she wanted to purchase heroin. CADET in turn called SIMON and asked whether SIMON was finished selling all the bricks of heroin SIMON had in his possession. CADET informed SIMON that he was going to meet BRAITHWAITE-LOVET on 3rd Avenue in Asbury Park which is the street where BRAITHWAITE-LOVET resides. CADET told SIMON to bring one brick of heroin because CADET was going to sell that brick to BRAITHWAITE-LOVET.

106.    On or about July 31, 2014, at approximately 9:56 a.m., BRAITHWAITE-LOVET called the Cadet Facility and spoke to CADET. During the call, BRAITHWAITE-LOVET asked, "is your brother around?" CADET responded, "yeah ... I'm about to tell him to stop over. When he do that take his um, take his number down too." CADET further stated, "I'm about to call him to see where he's at" and BRAITHWAITE-LOVET stated, "I'm outside." Based on the context of this and other conversations, BRAITHWAITE-LOVET called CADET and asked whether SIMON was available so she could purchase heroin. CADET informed BRAITHWAITE-LOVET that he would contact SIMON to see where he was. One minute after that call ended, at approximately 9:57 a.m., CADET placed a call over the Cadet Facility to SIMON. During the call, CADET asked SIMON, "do you remember the girl from 3rd?" and SIMON responded, "yeah." CADET then stated, "she's outside." SIMON subsequently told CADET, "tell her give me 15 minutes." CADET then told SIMON, "I think one" and SIMON responded, "I know. Don't worry." Based on the context of this and other conversations, CADET told SIMON that BRAITHWAITE-LOVET was outside his residence or a location near his residence ready to make a purchase of heroin. CADET also told SIMON that BRAITHWAITE-LOVET was going to purchase one brick of heroin.

**CANALES and COLLINS**

107.    Intercepted wire communications revealed that CANALES and COLLINS obtained heroin from CADET and SMITH and distributed it to others on numerous occasions.

108.    On or about July 24, 2014, at approximately 6:15 p.m., CANALES called the Cadet Facility and spoke to CADET.  During the call, CANALAS told CADET, "read between the lines.  I don't know if, or you went some place different or you did some bullshit which I think you did.  But that shit you gave me, garbage bro.  Straight garbage."  CANALES further stated, "I'm having such a hard time, man honestly."  CANALES subsequently asked CADET, "nobody said nothing to you about it?" and CADET responded, "nobody 'cause so far, so far … I only got like one left."  Based on the context of this and other conversations, CANALES told CADET that the quality of heroin CADET provided him was poor.  CADET informed CANALES that none of his other customers had complained about the quality of the heroin and told CANALES that he only had one brick of heroin left from that batch.

109.    On or about August 21, 2014, at approximately 8:24 p.m., CADET placed a call over the Cadet Facility to CANALES.  During the call, CADET told CANALES, "you only gave me two four."  In response, CANALES stated, "remember when you were saying 'oh, I'm gonna give you a little break, blah blah blah blah.'"  CADET said, "alright," and CANALES stated, "yeah, alright, my bad.  I thought you was like, 'cause the last time you was here you were like 'oh, I'm gonna cut you a break' on that or whatever.  So that's because, that's what I left you the last time bro.  Did you notice that or did you even bother counting when I left it with your brother?"  CADET then stated, "nah it's alright.  I'll just cut you a break.  Just make sure that this, that one, the regular."  Based on the context of this and other conversations, CADET told CANALES that CANALES did not pay CADET enough money for a recent narcotics purchase.  CANALES explained to CADET that he believed CADET was giving him a discount on the price of the narcotics he purchased.  CANALES further told CADET that the amount of money he gave CADET was the same amount CANALES paid during a previous purchase when CANALES left the money with CADET's brother JOSEPH.

110.    On or about August 23, 2014, at approximately 1:55 p.m., SMITH placed a call over the Smith Facility to COLLINS.  During the call, SMITH asked COLLINS, "how much money you owe me right now?" to which COLLINS responded, "like 12 5."  COLLINS then stated, "Well, 12, well 11 5 with the stack taken off."  SMITH then asked, "you gave somebody $1,000 when I was on vacation?" and COLLINS responded, "yeah."  SMITH then asked, "before this, how many you have?"  COLLINS responded, "before this one, how many I had?  I think 80, 50, I'm not sure."  SMITH then asked, "how much money you gave me for that?" and COLLINS responded, "it was 73, 75."  Based on the context of this and other conversations, SMITH asked COLLINS how much money COLLINS owed him for narcotics COLLINS previously purchased from SMITH.  COLLINS told SMITH that he owes him $11,500 because COLLINS paid the debt down by $1,000 while SMITH was out of town.  SMITH also asked COLLINS how much narcotics COLLINS had prior to the most recent purchase, and COLLINS told SMITH that he had either 80 or 50 bricks of heroin for which he paid either $7,300 or $7,500.

111.    On or about August 30, 2014, at approximately 9:59 a.m., an unidentified male who SMITH called "Papi" called the Smith Facility and spoke to SMITH.  During the call, Papi told SMITH, "What's up G?  I missed calling from you."  SMITH replied, "Oh, no, no… oh, fuck it, um… oh no, no, no, yeah because I was trying to, what's his name… next time I need what's the… but they never called me back with the, with the order so I was just like, you know what I mean?"  Papi responded, "Okay," and SMITH said, "As soon as I find out, I'ma let you know."  Based on the context of this and other conversations, Papi has been identified as one of the Cadet DTO's sources of supply.  During the call, SMITH told Papi that he has yet to place an order with Papi for narcotics because SMITH has not heard back from other individuals who also purchase narcotics from Papi.  SMITH told Papi that he would contact him to put in an order for a quantity of narcotics after SMITH spoke to the other individuals who would also be ordering narcotics.

112.    On or about August 31, 2014, at approximately 3:19 p.m., SMITH placed a call over the Smith Facility to the Cadet Facility and spoke to CADET.  During the call, CADET told SMITH, "I've been waiting on you."  SMITH stated, "nigga ain't man… I'm about to… yo I already told you that nigga ain't, what's name… I told you that shit.  I'm waiting on the nigga."  SMITH then asked CADET, "you want me to tell, you want me to just tell Pap to get something different?" and CADET responded, "Yeah hell yeah, as long as it's the usual man."  Based on the context of this and other conversations, SMITH asked CADET whether CADET wanted to order different narcotics from Papi.  CADET told SMITH that he wanted his usual order of narcotics.

113.    On or about August 31, 2014, at approximately 5:09 p.m., SMITH placed a call over the Smith Facility to COLLINS.  During the call, COLLINS asked, "uh, did you [U/I] nigga come?" and SMITH responded, "No.  I never put the order in."  SMITH further stated, "Aight, is [U/I], but I just don't… until I work for the money.  I got to give him the work.  You understand what I'm saying.  That's why I said you could've come with what's his name here already.  That's what I told you like… I don't what's the name.  I'm a try to put y'all down around the same time."  Based on the context of this and other conversations, COLLINS asked SMITH whether his narcotics source, Papi, had made a delivery of narcotics to SMITH.  SMITH advised COLLINS that his source did not come because SMITH did not put in an order for narcotics yet.  SMITH also explained to COLLINS that he was trying to connect COLLINS and others with his source of narcotics.

114.    On or about September 1, 2014, at approximately 3:50 p.m., "Papi" called the Smith Facility and spoke to SMITH.  During the call, Papi told SMITH, "I got bad news" and SMITH responded, "I can't hear you.  Say it again."  Papi then stated, "nobody can help me today.  You, you supposed to call me yesterday and you forgot it."  SMITH responded, "aight" and Papi stated, "yeah… but nothing tomorrow early, I got you."  Based on the context of this and other conversations, Papi told SMITH that he would not be able to deliver narcotics to SMITH that day.  Papi likely told SMITH that he would deliver the narcotics to SMITH the next day.

115.    On or about September 2, 2014, at approximately 6:21 p.m., Papi called the Smith Facility and spoke to SMITH.  During the call, Papi told SMITH, "yo.  I'm here" to which

SMITH responded, "you where?" Papi then stated, "in your house." SMITH replied, "oh, my God. Okay, wait a minute. Well I'm in Newark about to get my daughter." Based on the context of this and other conversations, Papi told SMITH that he was at SMITH's house, which is located at 2715 Ridgeway Road in Manchester in New Jersey, and ready to delivery narcotics to him, as Papi had stated he would during their September 1, 2014 call. SMITH informed Papi that he was not home at the time.

116.    On or about September 2, 2014, at approximately 6:23 p.m., SMITH placed a call over the Smith Facility to Papi. During the call, SMITH told Papi, "aight. Um… leave it in the white car." Papi then asked, "it's open?" to which SMITH responded, "yes, [U/I] yes. I'm not around so you gotta stop doing… I'm not around." Papi then stated, "alright, alright. I got you." SMITH then told Papi, "yeah but here's the thing, I had that bread for you" to which Papi responded, "yeah, I know." Based on the context of this and other conversations, SMITH told Papi to leave the narcotics Papi was delivering to SMITH in a white car parked at SMITH's residence. SMITH informed Papi that the doors to the white vehicle were unlocked. SMITH further told Papi that he had the money for Papi as payment for the narcotics.

117.    On or about September 2, 2014, at approximately 6:27 p.m., minutes after SMITH's call with Papi, SMITH placed a call over the Smith Facility to COLLINS. During the call, SMITH told COLLINS, "yeah call me when you get to my house, right now." COLLINS responded, "aight. You said… aight." Based on the context of this and other conversations, SMITH instructed COLLINS to go to the SMITH's residence in order to obtain a portion of the narcotics that Papi was going to leave in the white vehicle.

118.    On or about September 2, 2014, at approximately 7:13 p.m., SMITH placed a call over the Smith Facility to CANALES. During the call, in response to SMITH telling CANALES that he had not answered his phone on SMITH's previous attempts to contact him, CANALES told SMITH, "I was helping Guliana get in the shower. Just came from dialysis." SMITH then stated, "this is why you always made a horrible drug dealer you deal with bullshit emotion." SMITH subsequently told CANALES, "yeah motherfuckers is there. That's what I'm trying to tell you cause I just seen that stupid ass text." CANALES asked SMITH, "okay, do you want me to go or not?" SMITH responded, "you better hurry up and get it you got ten (10) minutes." CANALES then told SMITH, "I'm on my way out the door Eric" and SMITH stated, "call me whenever you get there." Based on the context of this and other conversations, SMITH told CANALES to go to the SMITH's residence in order to obtain a portion of the narcotics that that Papi was going to leave in the white vehicle.

119.    Based on the intercepted telephone calls on September 2, 2014 summarized above, law enforcement arrived at SMITH's residence and observed a white 2005 Acura RL parked in the driveway. As law enforcement conducted surveillance of the location, they observed both COLLINS and CANALES arrive at the residence and stand in the driveway near the white vehicle. Shortly thereafter, law enforcement detained COLLINS and CANALES. Upon presenting the white vehicle for examination by a trained law enforcement narcotics detection canine, the canine alerted law enforcement to the presence of narcotics in the vehicle. Pursuant to a search warrant, law enforcement searched the vehicle and uncovered 75 bricks of heroin.

120.    Law enforcement field-tested a sample of the substance and it tested positive for the presence of heroin.

## H. JEAN-BAPTISTE

121.    Intercepted wire communications revealed that H. JEAN-BAPTISTE obtained heroin from CADET and distributed it to others on numerous occasions.   The investigation has also revealed that H. JEAN-BAPTISTE stored and packaged quantities of heroin for the Cadet DTO for subsequent distribution to dealers and others.

122.    On or about June 28, 2014 at approximately 6:45 p.m., H. JEAN-BAPTISTE called the Cadet Facility and spoke to CADET.  During the call, H. JEAN-BAPTISTE stated, "Listen, listen, my man wants to know if anything decrease or if everything still the same?" CADET responded, "ain't nothing happen, only some buyers, their numbers change, high.  I'll talk to him, I'll see him on Monday."  Based on the context of this and other conversations, H. JEAN-BAPTISTE asked CADET whether his prices for heroin had changed.  In response, CADET told H. JEAN-BAPTISTE that the prices for some buyers went up.

123.    On or about June 30, 2014 at approximately 7:05 p.m., H. JEAN-BAPTISTE called the Cadet Facility and spoke to CADET.  During the call, CADET asked H. JEAN-BAPTISTE whether an unknown male "told him the number."  H. JEAN-BAPTISTE confirmed that the unknown male had given him the number, and CADET asked "how many you want?"  In response, H. JEAN-BAPTISTE stated "he right outside."  Moments later, an unknown male got on the call and said "yo."  CADET asked the unknown male how many he wanted and the unknown male stated, "20."  In response, CADET stated, "goddamn, you don't play no games." Based on the context of this and other conversations, CADET was negotiating the sale of 20 bricks of heroin with H. JEAN-BAPTISTE and an unknown male that was likely H. JEAN-BAPTISTE's customer.

124.    On or about September 1, 2014, at approximately 10:27 p.m., CADET placed a call over the Cadet Facility to H. JEAN-BAPTISTE.  During the call, CADET stated, "Let me know something" and asked H. JEAN-BAPTISTE "y'all good?"  H. JEAN-BAPTISTE responded, "Yeah, we almost done."  CADET then told H. JEAN-BAPTISTE, "Aight because [U/I] clean up… You, you throw away all the boxes, clean inside the house too."  Based on the context of this and other conversations, CADET called H. JEAN-BAPTISTE and asked if he and another person or persons, likely including CASIMIR, were finished cutting and packaging a batch of heroin.  H. JEAN-BAPTISTE informed CADET that they were almost finished. CADET told H. JEAN-BAPTISTE to throw away all the boxes which likely contained the unpackaged heroin.  CADET also told H. JEAN-BAPTISTE to clean the house after he finished packaging the heroin.

125.    On or about September 2, 2014, at approximately 3:39 p.m., CADET placed a call over the Cadet Facility to H. JEAN-BAPTISTE.  During the call, H. JEAN-BAPTISTE asked, "Where are you?" and CADET responded, "I'm coming, give me like 10 minutes."  CADET then told H. JEAN-BAPTISTE, "Yo. Start cleaning up, clean up, make sure that shit is how, is

how you found it." CADET further asked H. JEAN-BAPTISTE, "You throw away all the boxes?" and H. JEAN-BAPTISTE said "Yeah." Based on the context of this and other conversations, CADET again instructed H. JEAN-BAPTISTE to clean the location where he was packaging heroin for the Cadet DTO. CADET also asked H. JEAN-BAPTISTE again whether he threw away the boxes in which the unpackaged heroin was contained.

## S. JEAN-BAPTISTE

126. Intercepted wire communications revealed that S. JEAN-BAPTISTE obtained heroin from CADET and distributed it to others on numerous occasions.

127. On or about July 15, 2014, at approximately 3:09 p.m., CADET placed a call over the Cadet Facility to S. JEAN-BAPTISTE. During the call, S. JEAN-BAPTISTE asked CADET, "what time you coming down?" CADET responded, "I don't know" and S. JEAN-BAPTISTE stated, "The guy was asking for you." CADET asked, "why didn't he call me?" and S. JEAN-BAPTISTE stated, "I don't know." S. JEAN-BAPTISTE further stated, "he just told me to call you and … when you come down here to call him." Based on the context of this and other conversations, S. JEAN-BAPTISTE called CADET on behalf of one of his heroin customers who was interested in making a heroin purchase from CADET. CADET told S. JEAN-BAPTISTE that the individual had yet to call CADET.

128. On or about July 20, 2014, at approximately 8:45 p.m., CADET placed a call over the Cadet Facility to S. JEAN-BAPTISTE. During the call, CADET told S. JEAN-BAPTISTE, "I'm not coming out there man. I see you tomorrow." CADET further stated that he was not meeting with S. JEAN-BAPTISTE "because there's a lot of police out there, they lurking. Why you really need me?" S. JEAN-BAPTISTE stated, "Nah. Oh nah, nah" and CADET responded, "what's up, yo I see the dude never told me anything." S. JEAN-BAPTISTE then stated, "Because the nigga um, [U/I] of shit that he, like uh he scared to call you." S. JEAN-BAPTISTE further stated, "he supposed to come here in like an hour and then I told him uh, you don't need me to be around to fucking call him man." CADET stated, "Man, he good… Call and find out what's up man before I leave man, because I don't want to come man, to tell you the truth." Based on the context of this and other conversations, CADET told S. JEAN-BAPTISTE that he did not want to meet with S. JEAN-BAPTISTE to sell him heroin because there was a large law enforcement presence on the street that night. S. JEAN-BAPTISTE then spoke to CADET about an individual that is likely S. JEAN-BAPTISTE's customer who was apparently nervous about calling CADET outside of S. JEAN-BAPTISTE's presence.

129. On or about July 31, 2014, at approximately 12:05 p.m., S. JEAN-BAPTISTE called the Cadet Facility and spoke to CADET. During the call, S. JEAN-BAPTISTE asked, "Yo, where are you? Are you outside?" and CADET responded, "yeah." S. JEAN-BAPTISTE then told CADET, "Oh so, so, so bring, bring, bring two small ones." CADET responded, "Two? I said one." S. JEAN-BAPTISTE told CADET, "One? Okay one. Aight." Based on the context of this and other conversations, S. JEAN-BAPTISTE asked CADET to bring him two bricks of heroin, possibly for the customer that S. JEAN-BAPTISTE spoke to CADET about on previous occasions. CADET clarified that he was bringing one brick of heroin to S. JEAN-BAPTISTE.

**PARCIAS**

130.    Intercepted wire communications revealed that PARCIAS obtained heroin from CADET and distributed it to others on numerous occasions.

131.    On or about July 1, 2014, at approximately 6:19 p.m., CADET placed a call over the Cadet Facility to PARCIAS. During the call, CADET asked PARCIAS, "Damn, you don't have anything for me?" and PARCIAS responded, "Nah, not yet." CADET then asked, "six, five, or four?" and PARCIAS stated, "I would have to go check." CADET then stated, "Fuck it, you ain't even gotta check, leave it alone." Based on the context of this and other conversations, CADET asked PARCIAS whether he had any of the money that PARCIAS owed him, presumably from past heroin transactions, and PARCIAS stated that he did not have any money for him. CADET likely asked PARCIAS if he had between four hundred and six hundred dollars and PARCIAS stated that he would have to check.

132.    On or about July 8, 2014, at approximately 10:30 p.m., CADET placed a call over the Cadet Facility to PARCIAS. During the call, CADET asked PARCIAS, "You don't have anything for me?" In response, PARCIAS stated, "I got go grab it. You can't wait to the morning?" CADET told PARCIAS, "Nah, I'm trying to go... I already try to go to Walmart, I can't buy shit." PARCIAS stated, "you can't buy shit? Damn." CADET asked, "You have nothing on you?... Like, like five hundred?" PARCIAS responded, "yeah I could... yeah something like that." CADET then asked, "Send somebody to see you?" and PARCIAS stated, "yeah... At my mother shit." Based on the context of this and other conversations, CADET again called PARCIAS and asked for money. PARCIAS asked whether CADET could wait to collect the money in the morning, but CADET stated that he wanted at least $500 that night. PARCIAS stated that he believed he had $500 and CADET could send someone to his mother's house to come collect the money.

133.    On or about September 10, 2014, at approximately 5:10 p.m., CADET placed a call over the Cadet Facility to PARCIAS. During the call, CADET told PARCIAS, "Yo, I need you, I need you, I need you. Come to the hood 'cause I need what I told you, because I gotta get that nigga out the way." PARCIAS asked, "what?" and CADET responded, "I need you, I need you, I need you." CADET also stated, "I'm out right now. I'm at the dealer. I'm at the dealership." PARCIAS then asked, "oh, what you told me about the other day?" and CADET responded, "yeah, I need that." PARCIAS then stated, "aight, let me, let me grab, aight." Based on the context of this and other conversations, CADET told PARCIAS that he needed PARCIAS to go make a delivery of narcotics to an individual because CADET was busy at a car dealership and could not make the delivery himself. CADET talked to PARCIAS about this particular sale of narcotics on a previous occasion.

**BARNES**

134.    Intercepted wire communications revealed that BARNES obtained heroin from CADET and distributed it to others on numerous occasions.

135.    On or about July 13, 2014, at approximately 11:18 p.m., BARNES called the Cadet Facility and spoke to CADET.  During the call, BARNES told CADET, "you forgot to [U/I] give that ten, man."  CADET responded, "What you say?" and BARNES stated, "I said you forgot to give him that ten for me."  CADET then told BARNES, "He want half of that.  He said he gonna see how that go by."  BARNES responded, "It ain't got nothing to do with me, like I owe him."  BARNES further stated, "it don't matter if he got it…  You can still give him the other five or whatever."  In response, CADET stated, "Aight, I'll do that.  Yeah I'll just give it to him tomorrow."  Based on the context of this and other conversations, BARNES told CADET that he forgot to give an unknown male, likely BARNES' customer, 10 bricks of heroin on BARNES' behalf.  CADET told BARNES that the individual only wanted five bricks of heroin.  BARNES explained that he owed the unknown male some heroin, so CADET should give five bricks to the unknown male.

136.    On or about July 15, 2014, at approximately 2:02 p.m., BARNES called the Cadet Facility and spoke to CADET.  During the call, CADET told BARNES, "I'ma have to catch up with old boy later on."  BARNES stated, "I don't know; try to get in touch with him tomorrow or something…. they love the um… that new clothing line you been put out."  BARNES further stated, "I don't know if you can give him ten or five.  He say you can give him ten."  CADET responded, "I got it."  BARNES also told CADET, "just hurry up and make that shit happen [U/I] for real…. [U/I] that could've been gone already."  BARNES further stated, "I'm talking about the motherfucking other thing too, could been gone already.  You said you want to get rid of that shit quick.  My man was telling me though, he says… he got some people, I got my cousin and them too.  My cousin and them ready.  Just hit me."  Based on the context of this and other conversations, CADET told BARNES that he would try to meet with BARNES' heroin customer later that day or the next day.  BARNES told CADET that his customers love CADET's heroin and referred to the heroin in code as a "clothing line."  BARNES informed CADET that his customer wanted 10 bricks of heroin and CADET confirmed that he would provide that amount.  BARNES further told CADET that he had several people lined up waiting to purchase heroin from CADET, including his cousin.  BARNES also mentioned that CADET was looking to "get rid" of some of his heroin quickly.

137.    On or about July 24, 2014, at approximately 11:02 p.m., BARNES called the Cadet Facility and spoke to CADET.  During the call, BARNES told CADET that he had been trying to get in touch with CADET for a couple of days.  BARNES stated, "He trying to return the clothes."  BARNES further stated, "three pair of jeans type shit, he trying return them shits."  CADET then asked, "he said he can't work with that?" and BARNES responded, "Hell no.  Nigga was talking like he mad."  CADET told BARNES, "tell him to give it to dude.  I'm not going around that area."  Based on the context of this and other conversations, BARNES told CADET that one of his customers wanted to return the heroin he purchased from CADET.  Again, BARNES spoke in code and referred to the heroin as "three pair of jeans."  BARNES' customer was apparently upset regarding the quality of the heroin.  CADET told BARNES to tell his customer to return the heroin to an unknown individual.  Again, during this time period, CADET was receiving a lot of complaints about the quality of his heroin.

138.    On or about July 26, 2014, at approximately 4:11 p.m., BARNES called the Cadet Facility and spoke to CADET.  During the call, BARNES asked CADET, "Why you ain't give

33

me the 17?" BARNES further told CADET, "Every time I need you like, that shit take long as hell for me to reach you." BARNES also told CADET, "that shit killed me man. Cause it's Saturday yo. Shit…. you left me dry though man, how you gonna leave me like that?" In response, CADET told BARNES, "He ain't tell me to give him nothing" and BARNES stated, "man I told you 17 man, I say I got the paper man. You killing me with this man." BARNES further told CADET, "damn you killing me with this shit man. I told you, I was like yo, the 'new clothes, the new clothes' he just got … in that store is moving faster." CADET responded, "he ain't let me know about that." The conversation concluded with BARNES telling CADET he would call him back. Based on the context of this and other conversations, BARNES was upset that CADET did not provide him with the 17 bricks of heroin he requested from CADET. BARNES told CADET that he was "dry," meaning he had no heroin to sell during the weekend, so his business was suffering. BARNES further told CADET, in code, that the new type of heroin CADET provided was selling really quickly.

139.    On or about August 3, 2014, at approximately 6:36 p.m., BARNES called the Cadet Facility and spoke to CADET. During the call, CADET asked BARNES, "what's up with your little cousin?" BARNES replied, "I'm about to do something with him right now right. He was doubting, he was doubting that shit 'cause I gave him that bullshit man. That shit kinda fucked me up. I gave him the bullshit yo. The nigga was on some shit like yo, he said that shit was like trash, trash like, he wanted nothing to do with it so I gave that shit to my other peoples." In response, CADET stated, "I don't know" and "that's not bullshit." BARNES then told CADET, "I'm gonna talk to you about that shit when you get here though." Based on the context of this and other conversations, BARNES told CADET that the quality of heroin CADET previously provided him was poor, so BARNES' cousin complained about it and was skeptical about purchasing more heroin from CADET.

## BLAINE

140.    Intercepted wire communications revealed that BARNES obtained heroin from CADET and distributed it to others on numerous occasions.

141.    On or about July 24, 2014, at approximately 11:27 p.m., BLAINE called the Cadet Facility and spoke to CADET. During the call, BLAINE told CADET, "I've got that bread and shit, I mean, for the other stuff." CADET then stated, "oh you, you got out of the way alright" and BLAINE stated "yeah." CADET and BLAINE then discussed meeting somewhere that evening. CADET told BLAINE, "I'm in A.P." and "where I want you to meet me at is more up north." CADET asked BLAINE, "Do you go to work tomorrow?" In response, BLAINE told CADET, "Yeah, yeah. I can wait until tomorrow…. It's just, I mean. Like, 'cause I'm all done, you feel me? I'm trying to get my little shit up, so, you feel me? I want to make sure I got it, but I can wait until tomorrow, you know what I'm saying?" CADET and BLAINE then agreed to meet the next day. Based on the context of this and other conversations, BLAINE told CADET that he had money to purchase heroin from CADET. BLAINE informed CADET that he could wait to make the purchase the next day, but BLAINE was completely out of heroin for sale and wanted to get more.

142.   On or about August 2, 2014, at approximately 6:04 p.m., BLAINE called the Cadet Facility and spoke to CADET.  During the call, BLAINE told CADET, "I got that for you too; you know what I mean?  We got the bread already."  CADET then instructed BLAINE to call him on another cellular telephone and stated, "call me on the other phone, the blue phone." Based on the context of this and other conversations, BLAINE told CADET that he, and possibly another individual, was ready to make a heroin purchase and had the money for CADET. CADET then instructed BLAINE to call him on another cellular telephone so that they could discuss the heroin transaction further.

143.   On or about August 3, 2014, at approximately 6:04 p.m., CADET placed a call over the Cadet Facility to BLAINE.  During the call, CADET stated, "I'm about to come down there."  BLAINE told CADET, "Alright, so I'm about to be home right now.  I'm coming from Brick, but I'm going to my house right now, I'll see you in a probably like, 10, 15 minutes, alright?"  CADET then stated, "You ain't got to leave right now.  You can leave in like 30 minutes anyway… 'cause I'm about to see him first."  Based on the context of this and other conversations, CADET informed BLAINE that he was headed towards BLAINE's location to sell him heroin.  CADET further told BLAINE that he had to go see someone first, possibly to pick up the heroin that CADET planned to provide to BLAINE.

144.   On or about August 3, 2014, at approximately 7:03 p.m., CADET placed a call over the Cadet Facility to BLAINE.  During the call, CADET told BLAINE, "I am outside, bring a bag with you.  A book bag or something."  BLAINE responded, "alright."  Based on the context of this and other conversations, CADET arrived at BLAINE's location to sell him heroin. CADET told BLAINE to bring a bag or book bag in order to transport the heroin.

145.   On or about August 24, 2014, at approximately 8:07 p.m., BLAINE called the Cadet Facility and spoke to CADET.  During the call, CADET told BLAINE, "I ain't forget about you man" and BLAINE stated, "I ain't think you did."  BLAINE further told CADET, "Yeah, Gotti here too, he here with me whatever."  At that point, BARNES got on the phone and spoke to CADET and stated, "The real Gotti here, what's good though?... I'm staying here until I get my apartment man."  BARNES told CADET, "I need you to come through here man for real though."  CADET told BARNES, "I'm about to come out in a few seconds.  I was just waiting so it get dark."  Based on the context of this and other conversations, BLAINE called CADET because he needed to purchase heroin.  BARNES, who was living at BLAINE's residence at the time, got on the call and told CADET that he needed to purchase heroin from CADET that evening as well.

146.   On or about August 28, 2014, at approximately 5:07 p.m., BLAINE called the Cadet Facility and spoke to CADET.  During the call, BLAINE stated, "I'm about to call the other phone right now," to which CADET responded, "I ain't got that."  BLAINE then stated, "You ain't got it? Oh, okay.  Damn, I was about to say," and CADET cut him off and asked, "the green?"  BLAINE responded, "yeah, like the, nah, nah.  Just the switch. Yeah, not no just a switch, if you can do a switch or whatever?"  In response, CADET asked, "huh?" and BLAINE stated, "if you can switch the shit that I got, you know what I'm saying?"  CADET then replied, "they all the same."  BLAINE then stated, "nah, just the thing on it.  The corner, because I don't want to stay in the corner."  CADET then asked, "you talking about the name?" and BLAINE

said, "yeah."  CADET stated "I got to go look at it, I think that's the only name what it is."
BLAINE then stated, "I want to switch the names" and CADET replied, "I think it'll be kind of
hard.  I'm gonna look at it."  Based on the context of this and other conversations, BLAINE
called CADET and asked if CADET could provide BLAINE with heroin with a different
name/stamp on the glassine baggies.  The investigation has revealed that CADET's "Newport"
version heroin, as of the June 3rd and June 25th controlled purchases with CW2, was stamped
with green lettering.  When CADET asked about "the green," he was likely referring to the
Newport stamp of heroin.  CADET told BLAINE that he would have to look at the product and
see if it will be possible for him to change the name of the stamp on the heroin.

## CRAWLEY

147.    Intercepted wire communications revealed that CRAWLEY stored and packaged
quantities of heroin for the Cadet DTO.  CRAWLEY is CADET's girlfriend and at times resided
with CADET at his residence in Sayreville, New Jersey.

148.    On or about July 12, 2014, at approximately 11:09 a.m., CADET placed a call
over the Cadet Facility to CRAWLEY.  During the call, CADET asked CRAWLEY, "You
gonna come get that box from him?" and CRAWLEY asked, "You want me to come get it?"
CADET then stated, "If you gonna do it, if not then I'ma tell um, do where you started at and
then I'ma, he gotta replace it with how many you did."  CRAWLEY stated, "No, don't tell him
to do that.  He could do it but um, yeah cause I don't have a table here to do it and I can't you
know, I can't do it upstairs in front of the kids."  CADET stated, "Nah, they ain't even gonna
know nothing about that."  CADET further stated, "Trust me, they ain't gonna know nothing.
You know when they know?... They get into middle school."  Based on the context of this and
other conversations, CADET asked CRAWLEY if she was going to pick up a box containing
unpackaged heroin from an unknown male in order to package the heroin.  CRAWLEY advised
that she did not have a table at her residence to use for cutting and packaging the heroin.
CRAWLEY also told CADET that she could not work on the heroin while children were in her
home.  CADET told CRAWLEY that the children would understand what CRAWLEY was
doing.  CADET further advised that when the children are middle school aged, then they will
understand.

149.    On or about August 7, 2014, at approximately 5:07 p.m., CADET placed a call
over the Cadet Facility to CRAWLEY.  During the call, the following conversation, in part, took
place:

CADET:        You at the house?

CRAWLEY:   I just left the house.

CADET:        No, no go turn back around.

CRAWLEY:   Alright just let me [U/I]

CADET:          Remember, remember, remember the one I said was no good, on top of the refrigerator?

CRAWLEY:    Want me to do what?

CADET:          Bring all that with you.

CRAWLEY:    Where?

CADET:          To my mom house.

CRAWLEY:    Huh?

CADET:          The one I said was no good at the top of the fridge.  In the closet.

CRAWLEY:    Oh.

CADET:          The weak one.

CRAWLEY:    What is it?  Bring, what is it?

CADET:          I'm talking about the green.

CRAWLEY:    The green?

                                          ***

CADET:          Bring all… bring every last one.  Just put it, just put one bag, just vacuum it and just bring it.

CRAWLEY:    Okay…turning around now.

CADET:          And I wish you could separate, you could separate with the, from the um, one you did.

CRAWLEY:    What, you want me to do it?

CADET:          You could vacuum seal that one and you vacuum seal that one by itself.  Everything by… the one you did… the one same time you did, put that, put all of them together.  One… matter of fact just put everything together, that's it, just put everything together.  I ain't gonna make this hard for you.  Just put everything.  Whatever you see in there just grab everything.

CRAWLEY:    Aight.

CADET:          Put everything.  The one you did, everything put everything put it in there.  Just put it between the clothes.

Based on the context of this and other conversations, CADET asked CRAWLEY to retrieve from his residence a quantity of heroin that was poor quality and bring it to him.  When CADET referred to "the green," he was likely referring to the batch of heroin stamped "Newport" in green lettering.  CADET instructed CRAWLEY to vacuum seal all the heroin located above the refrigerator at his residence.  CADET also made reference to a quantity of heroin that CRAWLEY previously cut and packaged herself when he mentioned "the one you did."

## **WALKER**

150.    Intercepted wire communications revealed that WALKER obtained heroin from CADET and distributed it to others on numerous occasions.

151.    On or about June 28, 2014, at approximately 3:40 p.m., WALKER called the Cadet Facility and spoke to CADET.  During the call, WALKER asked CADET, "What's good?" and CADET responded, "I'm not ready yet."  CADET then stated, "it's up to you, you gotta wait 'til I come back…. I'll be back by Sunday night."  During this time, CADET was in Los Angeles, California and returned to New Jersey on or about Sunday, June 29, 2014.  WALKER told CADET, "Yeah, if it's from the same store then I don't mind."  CADET then stated, "Yeah it's from the same store, if something left…. I'll try and hold on to it."  CADET then stated, "Actually if you want, if you want to take a chance then it's gonna look different; it's your choice.  I ain't want to do that to you."  CADET and WALKER agreed to meet the next day when CADET was back in town.  Based on the context of this and other conversations, WALKER called CADET in order to arrange a purchase of heroin.  CADET informed WALKER that he was out of town and would be back the next day.  WALKER told CADET that he was fine with waiting to make the purchase as long as the heroin was of a same type and quality as heroin he previously purchased.  CADET confirmed that he would provide WALKER with the same type of heroin.

152.    On or about July 1, 2014, at approximately 6:42 p.m., WALKER called the Cadet Facility and spoke to CADET.  During the call, CADET told WALKER, "It ain't gonna be like the same thing like yesterday… It gonna be back as usual, as usual.  You good."  WALKER stated, "Aight, I gotta go bowling" and CADET responded, "I'll probably see you late night."  Based on the context of this and other conversations, CADET told WALKER that the price for the heroin was going to be usual price WALKER has paid in the past.  CADET told WALKER he would meet him that evening to sell WALKER heroin.

153.    On or about July 3, 2014, at approximately 6:14 p.m., WALKER called the Cadet Facility and spoke to CADET.  During the call, CADET told WALKER, "Just text me the number, that's all."  WALKER responded, "alright" and CADET stated, "They go back to usual.  It's back to the usual."  WALKER then stated , "oh okay, alright.  Alright, give me two seconds."  Based on the context of this and other conversations, CADET instructed WALKER to text him the number of bricks of heroin WALKER wanted to purchase.  CADET again told WALKER that the price for the heroin was back to normal.

154.    On or about July 3, 2014, at approximately 6:37 p.m., CADET placed a call over the Cadet Facility to WALKER.  During the call, WALKER told CADET, "I'm over my

sister's." CADET told WALKER, "It's gonna be awhile or you want meet me somewhere else?" WALKER responded, "I'll wait... I'll be here with him, aight." Based on the context of this and other conversations, WALKER told CADET that he was at his sister's residence and ready to purchase heroin from CADET. CADET informed WALKER that it would take some time for CADET to meet WALKER. WALKER told CADET that he, along with another individual, would be at the sister's residence waiting.

155.   On or about July 3, 2014, at approximately 10:03 p.m., CADET placed a call over the Cadet Facility to WALKER. During the call, CADET told WALKER, "Come outside real quick." WALKER, in speaking to someone in the background, stated, "I need the money." Based on the context of this and other conversations, CADET arrived at WALKER's location to sell WALKER a quantity of heroin. Before exiting the residence to meet with CADET, WALKER told a person there with him that he needed the money to purchase the heroin.

156.   On or about July 15, 2014, at approximately 6:38 p.m., CADET placed a call over the Cadet Facility to WALKER. During the call, CADET asked WALKER, "You ready?" and WALKER stated, "I'm going to my mom's. As long as it's not gonna be a long time... because I got to bowl at 7 o'clock." CADET stated, "I'm about to start heading over there right now." Based on the context of this and other conversations, CADET was going to meet WALKER to sell him a quantity of heroin.

157.   On or about July 15, 2014, at approximately 7:04 p.m., WALKER called the Cadet Facility and spoke to CADET. During the call, WALKER told CADET, "I'm at a bowling league at 7 o'clock man." In response, CADET stated, "I'm right here...I'm right there when the light turns green." WALKER stated, "Alright, I'm here, I'm sitting here." Based on the context of this and other conversations, WALKER called CADET and was upset that CADET still had not met WALKER to sell him the heroin. CADET informed WALKER that he would be arriving at WALKER's location shortly.

158.   On or about July 15, 2014, at approximately 7:23 p.m., CADET placed a call over the Cadet Facility to WALKER. During the call, CADET asked WALKER, "How much you give me?" and WALKER responded, "825." CADET told WALKER, "I didn't say 825.... You got it all messed up right now." WALKER told CADET, "I'm at the bowling alley bowling, you wanna come over here and talk to me?" WALKER told CADET that the bowling alley was located in Bradley Beach, New Jersey and CADET stated, "I'll be over there." Based on the context of this and other conversations, CADET questioned the amount of money WALKER provided him during the heroin transaction that evening. WALKER told CADET that he gave him $825 for the heroin and CADET told WALKER that $825 was not the correct price for the heroin.

159.   On or about July 15, 2014, at approximately 8:09 p.m., WALKER called the Cadet Facility and spoke to CADET. During the call, WALKER told CADET, "I'm about to bounce. Did you figure it out?" CADET stated, "Nah, nah because it's way off. It's way off.... What I get, since the last time you...it not nowhere near that. You just say what's yours." WALKER told CADET, "Wait, I'm lost." CADET asked WALKER, "Remember, remember I always double up for you?" and WALKER said, "Yeah." CADET then stated, "You ain't give

me double, you ain't give me no double. They no[where] near double." WALKER told CADET, "You gotta come talk to me because you losing me." CADET agreed to meet with WALKER to discuss the issue further. Based on the context of this and other conversations, CADET told WALKER that he did not give him enough money for the heroin CADET provided WALKER. CADET tried to explain his position, but WALKER did not understand what CADET said. WALKER told CADET to meet him so they could discuss the issue better in person.

## KEYES

160. Intercepted wire communications revealed that KEYES obtained heroin from CADET and distributed it to others on numerous occasions.

161. On or about July 24, 2014, at approximately 5:45 p.m., KEYES called the Cadet Facility and spoke to CADET. During the call, KEYES asked CADET, "Where you at?" and CADET responded that he was at "2nd and Pine" in Asbury Park. KEYES then stated, "Okay well you said you about to be on 2nd and Pine? Because I need to get my hands on something, like right this second." CADET told KEYES, "Yeah. Come, come talk to me" and KEYES said "Alright." Based on the context of this and other conversations, KEYES told CADET that he needed some heroin immediately. CADET told KEYES to meet him to purchase the heroin.

162. On or about August 5, 2014, at approximately 5:56 p.m., CADET placed a call over the Cadet Facility to KEYES. During the call, CADET asked KEYES, "where you at?" and KEYES stated, "I'm on my way to Walmart right now." CADET stated, "Oh, man I wish you could bust a U-turn and meet me on Ocean…. You not ready yet?" KEYES responded, "Nah, I'm not ready. I still, that's what I needed to talk to you about. I still got what you gave me but there's somebody else who wants exactly what you gave me." CADET told KEYES, "I'll see you later." KEYES stated, "I definitely need to see you though. You gonna have one of them for me? Cause I got something for you already. I'm not done with what you gave me." KEYES further told CADET, "just have one, have one of them on deck for me." CADET then stated, "Aight." Based on the context of this and other conversations, KEYES told CADET that he was not ready to make another purchase of heroin because he still had some of the heroin he previously purchased from CADET. KEYES told CADET, however, that another individual wanted to make a heroin purchase and asked CADET to have one brick of heroin ready for KEYES to purchase on the other individual's behalf.

163. On or about August 5, 2014, at approximately 6:36 p.m., KEYES called the Cadet Facility and spoke to CADET. During the call, CADET told KEYES, "Yo, meet me by my brother's shop. On Sewall and Memorial Drive." KEYES stated, "Aight. I'm coming around Asbury, I'll be right there." Based on the context of this and other conversations, CADET and KEYES arranged to meet at a location in Asbury Park so that CADET could sell KEYES a quantity of heroin per their August 5, 2014 telephone call at 5:56 p.m.

**MONESTIME**

164.    Intercepted wire communications revealed that MONESTIME obtained heroin from CADET and distributed it to others on numerous occasions.

165.    On or about June 26, 2014, at approximately 1:54 p.m., MONESTIME called the Cadet Facility and spoke to CADET.  During the call, CADET told MONESTIME, "My dude come down, come by my house right now a.s.a.p.  When I leave you going to be left out, don't cry on me."  MONESTIME told CADET, "You didn't tell me that" and CADET stated, "Yes, I did, I talked to you this morning."  CADET and MONESTIME then proceeded to argue about whether they spoke that morning.  CADET told MONESTIME, "you better get your ass down here, that's what you need to do."  CADET further told MONESTIME, "go to the house and I'm gonna, I'm gonna direct you where it's at."  MONESTIME then stated, "Alright, I'm coming right now."  CADET told MONESTIME, "just go in front of my mom's house…. I'ma show you where it's at."  Based on the context of this and other conversations, CADET told MONESTIME that one of his heroin sources made a delivery, so CADET directed MONESTIME to come to CADET's parents' house to pick up a quantity of heroin.  CADET told MONESTIME that he would tell him where the heroin was located once MONESTIME arrived at CADET's parents' house.

166.    On or about June 26, 2014, at approximately 2:05 p.m., MONESTIME called the Cadet Facility and spoke to CADET.  During the call, the following conversation, in part, took place:

| | |
|---|---|
| CADET: | You will see a brown paper right in that little corner in the flowers. |
| MONESTIME: | Yo.  Hello. |
| CADET: | Yeah. |
| MONESTIME: | I don't see it. |
| CADET: | It's in a brown piece of paper in the flowers.  You have to move the flowers, right in the corner on the right hand side, the flowers you see in front of the house, from the side of the garage. |
| MONESTIME: | Yeah, I'm by the garage now by the flowers and I see nothing. |
| CADET: | Alright, look in the corner, look all the way to your right, in the corner. |
| MONESTIME: | You mean to the left, I don't think to the right. |
| CADET: | Right.  You know where my mom be parking her car at? |

***

MONESTIME:     Yo, I don't see it man.

CADET:     Oh my God! It's a brown piece of paper, you have to move the flower… The flower block it, I blocked it with the flowers, you can't really see it.

<div align="center">***</div>

CADET:     Put your hand in it and you find a bag.  Put your hands in it.

MONESTIME:     My hands is in it, I went to this shit three times already, and it's not there man.

CADET:     Alright, I'm about to be over there [U/I] man.  You'll make me come all the way there for nothing; I'm trying to get a haircut.  I'm about to run late man.

MONESTIME:     Oh, you say, I see it, I see it.

CADET:     Yeah.

MONESTIME:     Aight.

CADET:     Aight.

Based on the context of this and other conversations, MONESTIME arrived at CADET's parents' residence and CADET tried to explain to MONESTIME where he hid the heroin for MONESTIME to pick up.  MONESTIME had difficulty finding the heroin, which CADET hid in the flowerbed in front of the house.  MONESTIME eventually found the heroin.

167.    On or about August 25, 2014, at approximately 5:20 p.m., MONESTIME called the Cadet Facility and spoke to CADET.  During the call, MONESTIME told CADET, "Yo, I'ma need you, yo.  You heard me?  I need you man."  CADET told MONESTIME, "I'm about to go to the chiropractor real quick.  Man, I'll see you after the chiropractor."  MONESTIME then told CADET, "Nah, I'm saying, I need something seriously.  I need $2000 from you man. You heard me?"  CADET stated, "I tell you what I'm about to do man."  MONESTIME responded, "You know I wouldn't ask you if I didn't need it man.  I'll give it back to you on the weekend man."  CADET then stated, "Aight man."  Based on the context of this and other conversations, MONESTIME asked CADET to borrow $2000 immediately.  CADET likely agreed to give MONESTIME the money.

168.    On or about August 25, 2014, at approximately 10:34 p.m., MONESTIME called the Cadet Facility and spoke to CADET.  During the call, CADET asked MONESTIME, "You need the money?" and MONESTIME responded, "Yeah, yo."  MONESTIME told CADET that he was approximately 45 minutes away from Asbury Park and asked CADET, "Should I call you when I get to Asbury Park?"  CADET stated, "Nah, you ain't gonna catch me, I'ma be

<div align="center">42</div>

somewhere else." MONESTIME then told CADET, "No you know what. Give it to Guysol for me." CADET told MONESTIME, "Call him" and MONESTIME stated, "Aight, I'ma call him." Based on the context of this and other conversations, CADET was trying to meet MONESTIME to give him the $2000 he asked to borrow. MONESTIME asked CADET to give the money to a person named Guysol since MONESTIME was not in the area at the time.

169.    On or about September 10, 2014, at approximately 2:25 p.m., MONESTIME called the Cadet Facility and spoke to CADET. During the call, MONESTIME asked CADET, "Are you home?" and CADET stated, "Nah, I'm in the hood." MONESTIME asked, "Can I come see you?" CADET stated, "Aight come on." MONESTIME asked, "You don't have people with you right?" CADET responded, "Yeah. I'm with T." CADET further told MONESTIME, "Man, if you come down you know how I do it. I'll jump in your car." Based on the context of this and other conversations, MONESTIME called CADET to arrange a purchase of heroin. MONESTIME wanted to know whether CADET was alone and CADET told MONESTIME that he was in Asbury Park with EL-BEY. CADET reassured MONESTIME that CADET would conduct the heroin transaction outside of EL-BEY's presence in MONESTIME's car.

## BRODIE

170.    Intercepted wire communications revealed that BRODIE obtained heroin from CADET and SMITH and distributed it to others on numerous occasions.

171.    On or about July 2, 2014, at approximately 3:38 p.m., BRODIE called the Cadet Facility and spoke to CADET. During the call, BRODIE told CADET, "This Marv. Uh, listen, I'ma be, I'ma be around at 5 o'clock. You'll be around?" CADET asked BRODIE, "Who you talking to?" and BRODIE responded, "EV." CADET told BRODIE, "Nah, not 5 o'clock, you gotta come now." BRODIE told CADET that he would not be able to make it and CADET stated, "Aight, I'll think of something, just call me, just call me. I'll figure something out for you." Based on the context of this and other conversations, BRODIE called CADET to arrange for the purchase of a quantity of heroin. SMITH likely told BRODIE to call CADET. CADET told BRODIE he would try to meet him that day.

172.    On or about August 23, 2014, at approximately 5:23 p.m., SMITH placed a call over the Smith Facility to BRODIE. During the call, SMITH said, "hey, Marv," and BRODIE responded, "yeah." Then the individual who SMITH has referred to as "Papi" got on the phone to talk to BRODIE. It appears Papi was with SMITH at the time and utilized SMITH's phone. When Papi got on the phone, he stated, "this is Papi. Look, look. Do you remember, do you remember uh, the day I coming… that no, no this Monday, no last Monday, the other one." Papi then asked, "how many, we… how many I come that day?" BRODIE responded, "I don't, I don't, rem… seventy-five?" Papi then stated, "no, you no remember." SMITH then got back on the phone and asked BRODIE, "Yo. Let me ask you something. How many times you know for him to gave me 100?" BRODIE responded, "a lot of times," and SMITH said, "no, I'm talking about recently." BRODIE then stated, "oh, not recently no." SMITH then asked, "how many times though do you know of him giving me, me getting a hundred from him?" BRODIE responded, "recently, like I think like once or twice. That's it. Or fifty, fifty, something like that, right?" SMITH then stated, in part, "yeah, twice. That's what I'm telling you twice."

43

Based on the context of this and other conversations, SMITH and Papi were trying to figure out how much heroin Papi provided to SMITH during a recent narcotics transaction.  In trying to determine the amount of narcotics that was purchased, SMITH and Papi called BRODIE to inquire as to whether he recalled how much was purchased.  It appears Papi believed he provided SMITH with 100 bricks of heroin, but SMITH and BRODIE believed it was only 50 bricks